# United States Court of Appeals
## For the First Circuit

No. 14-1177

SOUTH KINGSTOWN SCHOOL COMMITTEE,

Plaintiff, Appellee,

v.

JOANNA S., as parent of P.J.S.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Thompson, Kayatta and Barron,
Circuit Judges.

Christine H. Barrington, with whom ACCESS! Education Consulting was on brief, for appellant.
Mary Ann Carroll, with whom Brennan, Recupero, Cascione, Scungio & McAllister, LLP was on brief, for appellee.

December 9, 2014

**BARRON, Circuit Judge.** The Individuals with Disabilities Education Act, or IDEA, 20 U.S.C. § 1400 et seq., is a landmark federal statute now twenty-five years old. It offers federal funds to states that agree to provide protections to make sure disabled children receive a "free appropriate public education." Id. § 1412(1). Rhode Island, where this case arose, accepted IDEA funding and thus agreed to provide those protections. See 21-2-54 R.I. Code R. § 300.2(a). And that sets the stage for this appeal.

The appellee, South Kingstown School Committee, runs one of Rhode Island's public school districts. The appellant is the mother of a disabled child the School Committee is responsible for educating. The mother contends the School Committee failed to meet its IDEA obligations. She focuses in particular on the School Committee's failure to protect her right to an evaluation to determine her child's educational needs. See id. §§ 300.304, 300.502.

The outcome of this appeal turns in part on what the record shows about how well the School Committee performed an evaluation of the mother's child. But the outcome also turns on the meaning of a Settlement Agreement between the mother and the School Committee over which evaluations the School Committee would perform.

We hold the District Court rightly concluded the Settlement Agreement relieves the School Committee of any

-2-

obligation to perform or fund one of the evaluations the mother seeks. We also hold the District Court did not err in concluding there was insufficient factual support for her other evaluation request. Still, we remand for the District Court to consider whether the mother deserves attorneys' fees for her success in securing yet a third evaluation, which the School Committee did not challenge in District Court and thus does not contest here.

## I.

Joanna S. brings this appeal on behalf of her son, P.J. -- we use only initials out of respect for their privacy. P.J. is a disabled student. He used to attend a public school in the South Kingstown public school district, which the South Kingstown School Committee runs. P.J. now attends, with funding from the School Committee, a private school in East Providence, Rhode Island.

Joanna S. contends the Rhode Island statute and regulations that implement IDEA require the School Committee to pay for two independent evaluations of P.J. The first is an "occupational therapy" evaluation, which would evaluate P.J.'s motor skills and sensory processing abilities. The second is a "psychoeducational" evaluation, which would evaluate P.J.'s educational progress and needs.

Evaluations are integral to the way IDEA works. They determine whether a child "qualifies as a child with a disability" and thus for IDEA protection. 21-2-54 R.I. Code R. § 300.300(a).

-3-

For children who do qualify, like P.J., evaluations also perform another important function. They "assist in determining . . . [t]he content of the child's" Individualized Education Program, or IEP. Id. § 300.304(b)(1)(ii).

The IEP sets forth the services a disabled child will receive and the educational goals for that child. Id. § 300.320(a). The IEP thus gives practical substance to IDEA's right to a free appropriate public education. And for that reason, evaluations are a key means -- perhaps the key means -- for deciding the content of the protections IDEA offers.

In the first instance, the school district must perform IDEA evaluations. Id. §§ 300.301, 300.303, 300.304. But IDEA also provides for "independent" evaluations. For that type of evaluation, the parent selects the evaluator, id. § 300.502, and a school district must pay for that evaluation. But that obligation to pay kicks in only if a school district has first failed to perform its own evaluation well enough for it to be deemed "appropriate." Id. § 300.502(b)(2), (5). The right to have a school district pay for an independent evaluation, therefore, is a backstop. It offers a parent a remedy when a school district fails to carry out its evaluative responsibilities properly.

The dispute between Joanna S. and the School Committee that is at issue in this appeal does not directly concern an evaluation the School Committee must perform. Or, at least, Joanna

S. says it does not.  Instead, Joanna S. wants us to give effect to a favorable administrative ruling she characterizes as having required the School Committee to fund two independent evaluations.

The administrative ruling is not entirely clear, however, on that point.  The part of the administrative ruling that concerns the occupational therapy evaluation clearly does require an independent evaluation.  But the part that addresses the psychoeducational evaluation is more ambiguous.  It could be read to require the School Committee to pay for an independent psychoeducational evaluation or to require the School Committee to perform the psychoeducational evaluation itself.  As we will explain, we need not resolve the ambiguity.

To see why, though, we need to provide some further details about the history that underlies the dispute between Joanna S. and the School Committee over these evaluations.  Joanna S. first made the evaluation request that gave rise to this appeal in February of 2012.  That was when she brought what is known as a "due process complaint."  IDEA and the Rhode Island laws implementing IDEA allow both school districts and parents to file a "due process complaint."  Id. § 300.507(a)(1).  Such a complaint sets in motion a state administrative process for adjudicating a dispute over the "identification, evaluation, or educational placement of [a disabled] child or the provision of [free

appropriate public education] to the child." Id. § 300.503(a); see also id. § 300.507(a).

In her due process complaint, Joanna S. sought additional educational services for P.J. from the School Committee. These included a private school placement. She also sought eight new evaluations of P.J.

Before any administrative proceeding began, however, the School Committee agreed to a settlement with Joanna S. That settlement resolved Joanna S.'s due process complaint. In the Settlement Agreement, the School Committee promised to pay for P.J. to attend the Wolf School, a private school. The School Committee also agreed to perform four evaluations of P.J. before he began at the Wolf School. The four evaluations are listed in the Settlement Agreement as: "educational, cognitive, speech and language[,] and occupational therapy." In return, Joanna S. relinquished her request for the other evaluations she had demanded in her complaint. As we will see, however, there is a dispute about just how much she actually gave up.

Following the settlement, in late April of 2012, the School Committee performed the four evaluations of P.J. the School Committee had agreed to undertake. P.J. then enrolled in the Wolf School in September of 2012. On October 9, 2012, however, at a meeting with P.J.'s teachers and representatives of the School Committee, Joanna S. demanded ten additional evaluations of P.J.

These newly requested evaluations included independent versions of each of the four evaluations the School Committee had performed in April of 2012. Joanna S. reiterated this demand for ten additional evaluations in a letter to the School Committee dated October 22, 2012.

The School Committee decided not to comply with Joanna S.'s demands for more evaluations. The School Committee instead chose to file a "due process complaint" of its own. See id. § 300.502(b)(2)(i). The School Committee filed that due process complaint on October 30, 2012.[1] In the complaint, the School

---

[1] A school district has fifteen days to respond to a parent's demand for an independent evaluation. 21-2-54 R.I. Code R. § 300.502(b)(2). Within that time, the school district must either agree to provide the independent evaluation or "[f]ile a due process complaint to request a hearing to show that its evaluation is appropriate." Id. § 300.502(b)(2). Joanna S. contends the School Committee failed to file this due process complaint on time. She says the School Committee refused to respond to her oral demand for independent evaluations and instead insisted she demand them in writing. Joanna S. relies on regulatory guidance she says shows school districts may not require parents to provide written notice of their demand for an independent evaluation under a federal regulation then codified at 34 C.F.R. § 300.503(b), which a materially identical Rhode Island regulation that is codified at 21-2-54 R.I. Code R. § 300.502(b) goes on to implement as a matter of Rhode Island law. See Letter to Imber, Office of Special Educ. Programs (Aug. 18, 1992); Letter to Thorne, Office of Special Educ. Programs (Feb. 5, 1990). In consequence, Joanna S. argues the School Committee filed its due process complaint six days after the expiration of the regulation's fifteen-day period for such a filing, as she calculates that period from the time she made her oral request rather than from the time she made her written request. 21-2-54 R.I. Code R. § 300.502(b)(2). But even if the clock started when Joanna S. says it did, the procedural deadline at issue is not always a hard and fast one. Under Rhode Island's regulations, a parent may not receive substantive relief based on a procedural violation by a school district unless the violation

-7-

Committee argued the evaluations it had performed were "appropriate and that no further evaluations [were] needed at [that] time."

In the administrative proceeding that followed, the Hearing Officer appointed by the State of Rhode Island ruled against the School Committee. The Hearing Officer ruled some of the School Committee's evaluations of P.J. in April had not been "appropriate." The Hearing Officer thus ordered the School Committee to pay for one of the two evaluations at issue in this appeal (the occupational therapy evaluation), and to pay for, or perhaps instead to perform, the other (the psychoeducational evaluation).

The School Committee responded with a suit in federal District Court in Rhode Island. The School Committee's suit rested on a provision of IDEA that allows "any party aggrieved by the findings and decision" of an IDEA hearing officer to "bring a civil action . . . in a district court of the United States." 20 U.S.C.

---

"[i]mpeded the child's right" to a free and appropriate public education, "[s]ignificantly impaired the parent's opportunity to participate in the decisionmaking process regarding" the child's education, or "[c]aused a deprivation of educational benefit." Id. § 300.513(a)(2). Despite conceding the applicability of that rule, Joanna S. does not explain how the very slight delay involved here -- six days at the most -- had the required prejudicial effect. In fact, much of the responsibility for the delay seems to lie with Joanna S.: the School Committee sent her a letter requesting clarification the day after her purported oral demand, and Joanna S. did not respond until twelve days later . The School Committee then filed its due process complaint just a few days after it received Joanna S.'s responsive letter. We thus conclude the administrative decision was properly decided on "substantive grounds." Id. § 300.513(a).

§ 1415(i)(2)(A); D.R. ex rel. M.R. v. E. Brunswick Bd. of Educ., 109 F.3d 896, 898 (3d Cir. 1997) (citing the prior version of § 1415(i)(2)(A), then codified at 20 U.S.C. § 1415(e) (1996)).

Acting on cross motions for summary judgment, the District Court found the administrative record did not support the Hearing Officer's order that the School Committee fund an independent occupational therapy evaluation of P.J. The District Court also found the Settlement Agreement released any claim to a psychoeducational evaluation of P.J. that Joanna S. might have had. The District Court thus granted the School Committee's motion for summary judgment and denied Joanna S.'s. Joanna S. now appeals the District Court's decision.

## II.

The two evaluations at issue -- occupational therapy and psychoeducational -- present distinct issues. Like the District Court and the Hearing Officer, we consider them separately, although our standard of review is the same for both.

We decide legal issues de novo, and we review the District Court's factual findings only for clear error. González v. P.R. Dep't of Educ., 254 F.3d 350, 352 (1st Cir. 2001). For mixed questions of law and fact, we apply a "degree-of-deference continuum" depending on "to what extent a particular determination is law- or fact- dominated." Lessard v. Wilton-Lyndeborough Coop. Sch. Dist., 518 F.3d 18, 24 (1st Cir. 2008). Unlike the way we

-9-

review agency decisions under the Administrative Procedure Act, see, e.g., Puerto Rico v. United States, 490 F.3d 50, 60-61 (1st Cir. 2007), we defer to the District Court's factual findings, not to the state-appointed administrative officer's. Lessard, 518 F.3d at 24.

Still, we must ensure the District Court gave "due deference" to that officer's superior educational expertise. Id.; Hampton Sch. Dist. v. Dobrowolski, 976 F.2d 48, 52-53 (1st Cir. 1992). We have characterized the appropriate level of review by District Courts as "involved oversight," a standard which "falls somewhere between the highly deferential clear-error standard and the non-deferential de novo standard." Sebastian M. v. King Phillip Reg'l Sch. Dist., 685 F.3d 79, 84 (1st Cir. 2012)(quoting D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 35-36 (1st Cir. 2012)). Moreover, we have said before that, in cases of this sort, summary judgment motions are "simply a vehicle" for providing review of the underlying administrative ruling, and that is the case here.[2] See Sebastian M., 685 F.3d at 85.

---

[2] No party disputes that the parties' cross-motions for summary judgement "essentially" asked the District Court to "conduct[] a bench trial based on a stipulated record." Sebastian M., 685 F.3d at 85 (quoting Ojai Unified Sch. Dist. v. Jackson, 4 F.3d 1467, 1472 (9th Cir. 1993)).

We start with the occupational therapy evaluation. The Settlement Agreement identified this evaluation as one of the four the School Committee would perform. The School Committee then performed it. We thus set the Agreement to one side and focus on the only point that is in dispute about this evaluation -- whether the record at the administrative hearing shows the occupational therapy evaluation the School Committee did perform was "appropriate" and thus that the School Committee did not need to pay for an independent one. 21-2-54 R.I. Code R. § 300.502(b)(2).

Joanna S. argues the April 2012 occupational therapy evaluation was not "appropriate." See id. § 300.304(b), (c). She contends the School Committee did not consider "information provided by the parent," id. § 300.304(b)(1), did not use "a variety of assessment tools and strategies," id., did not ensure the tests that comprised the evaluation were administered by "trained and knowledgeable personnel," id. § 300.304(c)(1)(iv), and did not tailor those component tests "to assess specific areas of educational need," id. § 300.304(c)(2). She also contends the School Committee did not ensure its overall assessment "accurately reflect[ed] the child's aptitude or achievement level . . . rather than reflecting the child's impaired sensory . . . skills." Id. § 300.304(c)(3).

-11-

The Hearing Officer agreed with Joanna S. that the occupational therapy evaluation was not "sufficiently comprehensive to identify all of the Student's needs in this area." She found several flaws in the School Committee's evaluation. The Hearing Officer thus ordered the School Committee to fund the independent occupational therapy evaluation Joanna S. now seeks.

In reversing the Hearing Officer's order, the District Court rejected three key factual findings the Hearing Officer had made. Those three findings addressed alleged problems with the School Committee's occupational therapy evaluation. We find nothing in the record to indicate the District Court clearly erred in rejecting those three findings. See Lessard, 518 F.3d at 24. We also see nothing in the record to suggest the District Court erred in ruling that, without those three challenged findings, the School Committee's occupational therapy evaluation of P.J. was "appropriate." For that reason, we affirm the District Court's decision.

The first of the disputed Hearing Officer findings concerned whether the evaluator considered information about the child that the parent had provided. See 21-2-54 R.I. Code R. § 300.304(b)(1). The Hearing Officer found the evaluator failed to provide such consideration, because the evaluator was not aware of Joanna S.'s concerns about her son's sensory processing abilities. But the administrative record well supports the District Court's

conclusion that the evaluator was aware of Joanna S.'s concerns about her son's sensory processing abilities. The District Court noted the evaluator testified she was told, in advance of the evaluation, about Joanna S.'s sensory processing concerns, and there was no contrary testimony. Moreover, the District Court correctly noted the evaluator's report recited "sensory processing concerns" as a reason for the performance of the occupational therapy evaluation.

The record similarly supports the District Court's rejection of the second of the Hearing Officer's disputed findings -- namely, the Hearing Officer's determination that P.J.'s "lack of effort" on some of the tasks undermined the evaluation as a whole. The Hearing Officer relied on the evaluator's statement that "the results should be viewed with caution" because of P.J.'s lack of effort during the test. But the evaluator raised that concern with respect to two sub-tests -- handwriting and drawing geometric shapes. The evaluator did not, as the District Court observed, call the evaluation as a whole into question.

In addition, the record shows the evaluator also testified, without contradiction, that a subsequent evaluation performed by the Wolf School allayed any concerns about the student's handwriting. What's more, the educators at the Wolf School, including the Wolf School's occupational therapist, testified the School Committee's tests, combined with their own

-13-

formal and informal assessments, were adequate. And, as the District Court noted, the Hearing Officer made no adverse credibility finding with respect to the Wolf School's occupational therapist.

We recognize Joanna S. argues the District Court erred in relying on the Wolf School evaluations. She contends the Wolf School evaluations were impermissible "supplement[al]" evaluations. She cites regulatory guidance from the U.S. Department of Education to support her position. See Letter to Gray, Office of Special Educ. Programs (Oct. 5, 1988).

But the guidance addresses a different issue. The guidance responds to the concern that a school district, when faced with a parental request to pay for independent evaluations, will resort to "supplemental" evaluations as a delaying tactic. The worry is that school districts will put off paying for a test performed independently by adding on new tests to correct the claimed flaws in the initial one they performed.

But there is no evidence that is what happened here. The record does not show the Wolf School performed its evaluations in response to Joanna S.'s complaint for an independent evaluation, let alone that it performed them to delay payment for an independent one. Instead, it appears from the record that the Wolf School performed the evaluations in the course of educating P.J. and long before Joanna S. requested an independent evaluation. The

-14-

record thus provides no support for concluding these evaluations were "supplemental" in the potentially problematic sense the guidance addresses. And the District Court did nothing improper to the extent it treated the Wolf School evaluations as if they were part of the occupational therapy evaluation the School Committee performed. The regulations make clear school districts may use "a variety of assessment tools and strategies" to make up an "evaluation"; they need not rely on just one test. 21-2-54 R.I. Code R. § 300.304(b)(1).

Finally, we conclude the record supports the District Court's rejection of the Hearing Officer's third disputed finding: that although the School Committee's evaluation found P.J.'s sensory processing abilities "typical," the evaluation report never defined the word "typical." As the District Court observed, the evaluator's occupational therapy report <u>does</u> define "Typical Performance."

The report explains that scores marked as "Typical Performance" "indicate typical sensory processing abilities." And the record supports the conclusion that such an explanation, in context, is meaningful. The report contrasts "Typical Performance," the highest score, with both "Probable Difference," which "indicate[s] questionable areas of sensory processing abilities," and "Definite Difference," which "indicate[s] definite sensory processing problems." "Typical," then, means something

quite intelligible: abilities that, for the child's age, are neither questionable nor definitely problematic. Cf. Am. Heritage Dictionary 1310 (2d Coll. Ed. 1991) (defining "typical" to mean "[e]xhibiting the traits or characteristics peculiar to its kind, class, or group; representative of a whole group").

Without those rejected findings, we are left only with the Hearing Officer's otherwise unchallenged finding that a "qualified, licensed and experienced" evaluator conducted the occupational therapy evaluation using "widely used standardized test[s]," which, the record goes on to show, produced results P.J.'s educators found adequate (together with their own assessments) to determine his occupational therapy needs. We thus affirm the District Court's order finding the occupational therapy evaluation the School Committee performed to have been "appropriate."

## IV.

That brings us to the dispute over the psychoeducational evaluation. This evaluation, unlike the occupational therapy evaluation, was not one of the four evaluations the School Committee agreed to perform in the April 2012 Settlement Agreement. For that reason, the School Committee contends, and the District Court held, the Settlement Agreement relieves the School Committee from having to perform or pay for any such evaluation. That is so, the School Committee argues, because Joanna S. gave up her right to

-16-

seek evaluations beyond the four specified in that Agreement when she signed it. We agree, but the route to that conclusion is a somewhat winding one.

**A.**

We first have to consider our power to take account of the Settlement Agreement at all. Joanna S. argues we may not. Her contention focuses on two subsections of IDEA that set up a "mediation process" and a "resolution process" to resolve disagreements between parents and school districts. 20 U.S.C. § 1415(e), (f). Courts have interpreted these subsections to include a grant of subject-matter jurisdiction for federal courts to decide suits to enforce settlement agreements reached during those processes. See, e.g., El Paso Indep. Sch. Dist. v. Richard R. ex rel. R.R., 591 F.3d 417, 427 (5th Cir. 2009) (citing 20 U.S.C. § 1415(f)). Joanna S. notes that nothing in the record conclusively shows the Settlement Agreement resulted from these statutory processes. And so, she argues, we cannot rely on the grant of jurisdiction in those subsections to consider the Settlement Agreement, which she characterizes as merely a state-law contract.

But our authority to hear this case does not depend on 20 U.S.C. § 1415(e) or (f). This is not an independent action to enforce an IDEA settlement agreement. Rather, the District Court's authority in this case came from a separate provision,

§ 1415(i)(2)(A). That provision authorizes a school district, when it is the "party aggrieved," to challenge an IDEA hearing officer decision in a federal district court. We have appellate jurisdiction over that same suit under the general grant of jurisdiction to the circuit courts to review the decisions of federal district courts. See 28 U.S.C. § 1291. And Joanna S.'s underlying assertion of a federal right to evaluations under IDEA supplies the "federal ingredient" making those statutory grants constitutional in this case. See Merrell Dow Pharms. Inc. v. Thompson, 478 U.S. 804, 807 (1986); Osborn v. Bank of United States, 22 U.S. (9 Wheat.) 738, 823 (1824).

Nor is there any bar to our considering the Settlement Agreement in the course of our review. Federal courts regularly give effect to state-law settlement agreements in federal-question cases. See, e.g., Great Clips, Inc. v. Hair Cuttery of Greater Bos., L.L.C., 591 F.3d 32, 35 (1st Cir. 2010) (relying on a state-law contract settling a trademark dispute); D.R. ex rel. M.R. v. E. Brunswick Bd. of Educ., 109 F.3d 896, 898 (3d Cir. 1997) (relying on a state-law contract settling an IDEA claim); see also Osborn, 22 U.S. (9 Wheat.) at 822 (explaining there is no constitutional rule in federal-question cases that "the judicial power . . . extend[s] . . . to those parts of cases only which present the particular question involving" federal law). And, as IDEA plainly permits settlements of disputes within its scope, we see no reason

to read IDEA to require a different result here.  Cf. Mayhew v. Burwell, ___ F.3d ____, No. 14-1300, 2014 WL 6224938, at *3 n.4 (1st Cir. Nov. 17, 2014) (exercising jurisdiction over constitutional arguments presented for the first time on appeal from an agency decision, to avoid the "nonsensical" result of "requir[ing] a bifurcated challenge" to administrative action).[3]

**B.**

That we may consider the effect of the Settlement Agreement does not mean it bars Joanna S.'s request regarding the psychoeducational evaluation.  The parties, following the District Court, frame the issue of the Agreement's effect as one within the domain of "res judicata."  But we have previously remarked that "[r]es judicata is a doubtful label" to use in the context of a settlement of an administrative proceeding.  Martinez-Vélez v. Rey-

---

[3]  We need not address the separate issue whether the Hearing Officer in the course of performing her statutory duties had the authority to consider the Settlement Agreement as a defense, a question that seems to have divided lower courts.  Compare J.K. v. Council Rock Sch. Dist., 833 F. Supp. 2d 436, 450 (E.D. Pa. 2011) (no such authority) with, e.g., D.B.A. ex rel. Snerlling v. Special Sch. Dist. No. 1, No. 10-1045, 2010 WL 5300946, at *4 (D. Minn. Dec. 20, 2010) (authority under at least some circumstances).  Even if the Hearing Officer lacked such authority, it would not affect the authority of a federal court to conduct the review Congress authorized.  Cf. Mayhew, 2014 WL 6224938, at *3 n.4; Elgin v. Dep't of Treasury, 132 S. Ct. 2126, 2137 (2012) (explaining that courts reviewing administrative decisions have jurisdiction to consider even issues the administrative body "professed [a] lack of authority" to consider).

<u>Hernández</u>, 506 F.3d 32, 45 (1st Cir. 2007).[4]  In this case as in that one, however, "the label does not matter; the question is the scope" of the Settlement Agreement.  <u>Id.</u>  To answer that question, we must look at the Agreement more closely.

## 1.

Joanna S. contends the Settlement Agreement, by its plain terms, applies to her claims under IDEA only "through the date of [that] Agreement."  And since her request for the additional evaluation at issue (the psychoeducational one) post-dates the Agreement, Joanna S. contends the settlement gives the School Committee no defense against the Hearing Officer's order.

But Joanna S. consented in that Agreement to only four evaluations -- and thus to the release of her claims for other evaluations, including even her claims for the additional four she had previously demanded in the due process complaint the Settlement Agreement resolved.  That consent would be meaningless if she could

---

[4] Our cases have recognized and differentiated between two possible defenses arising from a settlement agreement: "res judicata" and "release."  <u>See</u> <u>Davignon</u> v. <u>Clemmey</u>, 322 F.3d 1, 17 (1st Cir 2003).  The defenses are "<u>separate and distinct</u>," <u>id.</u> (quoting <u>Nottingham Partners</u> v. <u>Trans-Lux Corp.</u>, 925 F.2d 29, 31-32 (1st Cir. 1991)), and "res judicata," unlike "release," requires entry of judgment. <u>See</u> <u>Reppert</u> v. <u>Marvin Lumber & Cedar Co.</u>, 359 F.3d 53, 56 (1st Cir. 2004).  "Whether and when res judicata operates in administrative proceedings is complicated; so, too, the question when a settlement of administrative proceeding[s] has res judicata effect." <u>Martinez-Vélez</u>, 506 F.3d at 45 n.9.  As in <u>Martinez-Vélez</u>, there is no need for us to address those "complicated" questions here, because whether under res judicata or release, the effect of the Settlement Agreement turns on its language's "scope." <u>Id.</u> at 45.

nonetheless turn around the next day and demand the foregone evaluations anew. We thus cannot accept her preferred reading of the Agreement, as we find it difficult to suppose the parties intended such a meaningless outcome of their negotiations. See AccuSoft Corp. v. Palo, 237 F.3d 31, 40 (1st Cir. 2001) (explaining that intent of the parties is one factor in interpreting a settlement agreement).

In its brief, the School Committee took the categorical position that the Agreement resolved Joanna S.'s demands for evaluations at least through the end of the 2012-2013 school year. But the School Committee abandoned that position at oral argument. It instead favored a narrower focus on changed circumstances. We agree with the School Committee's revised approach. The Agreement is best read to release any right to additional evaluations that Joanna S. may have had, except when her request for one arises from a change in the conditions that prevailed at the time she signed the Agreement.

This interpretation tracks the Agreement's text. The Agreement waived "any and all causes of action . . . [of] which [Joanna S.] kn[ew] or should have known" when she signed the Agreement. Because unforeseeable events may give rise to unforeseeable grounds for complaint, the Agreement may comfortably be read to preserve requests premised on new circumstances that may arise. But allowing for that possibility still gives content to

-21-

the Agreement in a way Joanna S.'s proposed reading would not.  On this reading, Joanna S. still faces a hurdle when she makes post-Agreement requests for evaluations not among those agreed to in the settlement.  Such requests, to survive the settlement, must rest on conditions that arose after she entered into that Agreement.

This reading of the Agreement also accords with the approach the Third Circuit took in construing a similar settlement agreement.  See E. Brunswick Bd. of Educ., 109 F.3d at 900-01.  There, the court held an IDEA settlement could preclude a parent from bringing future IDEA claims -- unless, that is, those claims were based on changed circumstances.  That conclusion reflects both the role settlements may play in resolving IDEA disputes and the legitimate concern with allowing IDEA settlements to bargain away -- potentially for all time and without regard to the change in conditions that may arise in the course of a child's development -- the statutory right to a free appropriate public education.

**2.**

So understood, the effect of the Agreement is clear.  It bars the Hearing Officer's order regarding the psychoeducational evaluation unless that order may be said to rest on conditions that changed since the time of settlement in April of 2012.  For reasons we will explain, the record does not reveal any sufficient change in circumstances.  As a result, the order cannot overcome the bar posed by the Settlement Agreement, whether we characterize it in

-22-

the way Joanna S. does (as requiring the School Committee to fund an independent psychoeducational evaluation) or as the District Court did (as requiring the School Committee to perform a psychoeducational evaluation itself).

We reach this conclusion aware the District Court did not focus on changed circumstances, as neither party framed the issue that way below. But we may affirm that court's summary-judgment decision on any basis apparent from the record. See CMI Capital Mkt. Inv., LLC v. González-Toro, 520 F.3d 58, 65 (1st Cir. 2008). And nothing in the Hearing Officer's decision suggests the order rests on a new, post-settlement development. Rather, the Hearing Officer offered only pre-April 2012 justifications for her order. She explained that "[t]he Parent has been requesting independent evaluations for some time, requests that have been considered, but with no agreement to do them," and she noted in particular "a discussion about obtaining a psychoneurological evaluation apparently, which was rejected in the Settlement Agreement."

Nor does Joanna S. identify sufficient changed conditions in her brief. Joanna S. argues the order may be supported because of P.J.'s "past and present behavior presentations," but she does not identify any changes in P.J.'s behavioral presentations that occurred after the settlement. Joanna S. also refers in her brief to the need to identify whether P.J. has dyslexia, but she claims

she was already concerned about dyslexia in April of 2012 when she signed the Settlement Agreement.[5]

At oral argument, Joanna S.'s counsel did assert for the first time that P.J.'s extended absence before he began attending the Wolf School constituted a changed circumstance -- as he stayed out of school after the settlement until the start of the next school year. But Joanna S.'s counsel did not explain how P.J.'s continued absence from school -- the start of which predated the Settlement Agreement by at least a month -- supports that conclusory contention. Nor did Joanna S. argue in her brief that this absence established a changed circumstance. Such a bare assertion of changed conditions, raised for the first time at oral argument, does not suffice to warrant reversal of the District Court's judgment, given Joanna S.'s failure to identify -- to the District Court or to us -- any facts in the administrative record showing a material change in conditions.

Thus, like the District Court, but for a slightly different reason, we conclude the Settlement Agreement relieves the School Committee from having to pay for, or conduct, the

---

[5]    Those arguments were not ones offered by the Hearing Officer. The parties do not brief whether Security & Exchange Commission v. Chenery Corp., 318 U.S. 80 (1943), or possibly doctrines of waiver or forfeiture, would preclude us from reinstating the state Hearing Officer's order on an alternate ground from the one she gave, and we need not address them here. Cf. Christopher S. ex rel. Rita S. v. Stanislaus Cnty. Office of Educ., 384 F.3d 1205, 1212 n.5 (9th Cir. 2004) (invoking Chenery in the IDEA context).

psychoeducational evaluation the Hearing Officer ordered. The extent to which conditions must change, as they often do as children grow and develop, before a release no longer bars a requested evaluation is an issue we do not address in this appeal.

**3.**

In an apparent effort to avoid this result, Joanna S. argues the Hearing Officer ordered the psychoeducational evaluation "sua sponte," rather than at Joanna S.'s request. She suggests this understanding of the Hearing Officer's action should protect it from being overturned, presumably because she believes the order's sua sponte nature removes it from the scope of the settlement.

But even if the Settlement Agreement would for some reason not bar a sua sponte order, nothing in the record suggests this order was in fact issued sua sponte. A "sua sponte" order is one issued "[w]ithout prompting or suggestion." Black's Law Dictionary 1650 (10th Ed. 2014). The Hearing Officer did not characterize the order in that way. Rather, she based her order on Joanna S.'s past "requests" and "concerns." Moreover, the content of the psychoeducational evaluation the Hearing Officer ordered -- "reading, writing, math, sensory difficulty, written language, executive function, behavior, independent functioning, difficulty with balance and gross motor skills, and assistive technology if deemed necessary" -- appears directly responsive to the kind of

evaluation Joanna S. sought in the letter that gave rise to the School Committee's due process complaint.[6]  In addition, the Hearing Officer never mentioned the sole provision Joanna S. claims authorized the Hearing Officer to order the psychoeducational evaluation sua sponte: 21-2-54 R.I. Code R. § 300.502(d).[7]  We therefore cannot accept Joanna S.'s argument that the Hearing Officer intended to order relief Joanna S. did not request.  And, because we conclude the order was not issued sua sponte, we need not address what the effect of the Settlement Agreement on a sua sponte order would have been.

**V.**

One issue remains -- Joanna S.'s request for attorneys' fees.  IDEA provides that "the court, in its discretion, may award reasonable attorneys' fees" to a prevailing party.  20 U.S.C. § 1415(i)(3)(B)(i).  Even though we have affirmed the District

---

[6]  In her letter, Joanna S. had demanded an "achievement evaluation," a "psychological evaluation," a "speech and language evaluation," an "OT [occupational therapy] evaluation," a "comprehensive neuropsychological evaluation," a "comprehensive psychiatric evaluation," a "comprehensive reading evaluation," a "comprehensive math evaluation," a "comprehensive assistive technology evaluation," and a "comprehensive PT [physical therapy] evaluation."

[7]  That section provides: "If a hearing officer requests an independent educational evaluation as part of a hearing on a due process complaint, the cost of the evaluation must be at public expense."  21-2-54 R.I. Code R. § 300.502(d).  It is not at all clear that this section authorizes a hearing officer to order an evaluation -- by its terms it seems to address only cost, not authority -- but we need not address this section's scope here because the Hearing Officer did not rely on it.

Court, the School Committee left one aspect of the Hearing Officer's decision unchallenged. In addition to ordering the School Committee to act with respect to an occupational therapy evaluation and a psychoeducational evaluation, the Hearing Officer also found the School Committee's "educational" evaluation was not appropriate. Because the School Committee chose not to challenge that finding, Joanna S. is a prevailing party with respect to that one portion of her claim and is thus eligible for fees. See A.R. ex. rel. R.V. v. N.Y. City Dep't of Educ., 407 F.3d 65, 75 (2d Cir. 2005) ("[A] plaintiff who receives [hearing officer]-ordered relief on the merits in an IDEA administrative proceeding is a 'prevailing party.' He or she may therefore be entitled to payment of attorneys' fees under IDEA's fee-shifting provisions."). We remand so the District Court may consider in the first instance whether and to what extent attorneys' fees should be ordered.

## VI.

As we have explained, evaluations are crucial to IDEA. They help ensure children receive the free appropriate public education Congress envisioned. It is thus not surprising that disputes arise over IDEA evaluations. But in addition to providing an administrative process for addressing such disputes, Congress also expressly allowed parties to resolve them through settlements. And when parties do so, the settlements must be given appropriate effect. For the reasons given above, we affirm the District

Court's reversal of the Hearing Officer's orders regarding the occupational therapy and psychoeducational evaluations.  We also remand for the District Court to consider whether Joanna S. is entitled to attorneys' fees based on her success in securing the Hearing Officer's order for an independent educational evaluation.

-28-