# United States Court of Appeals
## For the First Circuit

No. 20-2114

G.D., by and through her Parents and Next Friends, JEFFREY and
MELISSA D.,

Plaintiffs, Appellants,

v.

SWAMPSCOTT PUBLIC SCHOOLS; BUREAU OF SPECIAL EDUCATION APPEALS,

Defendants, Appellees.


APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]


Before

Howard, Chief Judge,
Barron, Circuit Judge,
and Singal, District Judge.*


Robert E. Curtis, Jr., with whom Melissa S. Dragon was on
brief for appellants.
Felicia S. Vasudevan, with whom Doris R. MacKenzie Ehrens and
Murphy, Hesse, Toomey & Lehane, LLP were on brief for appellees.


February 7, 2022


---

* Of the District of Maine, sitting by designation.

BARRON, **Circuit Judge**. Jeffrey and Melissa D., on behalf of their child ("G.D."), sought a determination from the Massachusetts Bureau of Special Education Appeals ("BSEA") that G.D.'s public school district failed to provide her with a free appropriate public school education as required under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq. They also sought reimbursement from the school district for tuition expenses associated with their unilateral placement of G.D. at a nearby private school. After a hearing, the BSEA denied their claims, and they filed suit against the school district and the BSEA in the United States District Court for the District of Massachusetts. The District Court granted judgment to the defendants. We affirm.

**I.**

**A.**

The IDEA requires states that receive federal financial assistance under the statute to offer eligible children with disabilities a "free appropriate public education," or, as it is often called, a "FAPE." See Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1, 137 S. Ct. 988, 993 (2017); see also 20 U.S.C. § 1412(a)(1). "'The primary vehicle for delivery of a FAPE' is an Individualized Education Program ('IEP')." Johnson v. Boston Pub. Schs., 906 F.3d 182, 185 (1st Cir. 2018) (quoting D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 34 (1st Cir. 2012)).

An IEP is the primary "means by which special education and related services" are provided to an eligible child, see Endrew F., 137 S. Ct. at 994, and it is composed of "a written statement for each child with a disability that is developed, reviewed, and revised in accordance with" federal law and regulations. 20 U.S.C. § 1414(d)(1)(A)(i); see also 34 C.F.R. § 300.324; 603 Mass. Code Regs. 28.05. That written statement must include "the child's present level of educational attainment, the short- and long-term goals for his or her education, objective criteria with which to measure progress toward those goals, and the specific services to be offered." Lessard v. Wilton-Lyndeborough Coop. Sch. Dist., 518 F.3d 18, 23 (1st Cir. 2008); see also 603 Mass. Code Regs. 28.05(4).

In Massachusetts, school districts are responsible for the development and administration of IEPs. See 603 Mass. Code Regs. 28.10. A school district must take care to ensure, in satisfying the IDEA's requirement that eligible children be provided with a FAPE, that the IEP is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." Endrew F., 137 S. Ct. at 999.

If, upon issuance of the IEP by the relevant school district, the parents of the child receiving the IEP believe that the IEP is not "reasonably calculated to enable [their] child to make progress appropriate in light of [their] child's

circumstances," id., or believe that the development and administration of the IEP otherwise violates the IDEA's requirements, the parents may file a complaint with the school district to challenge the IEP. See 20 U.S.C. § 1415(b)(6); see also D.B., 675 F.3d at 35. The filing of a complaint kicks off an informal dispute resolution procedure conducted by the school district. See 20 U.S.C. § 1415(f)(1)(B). If the school district fails to "resolve[] the complaint to the satisfaction of the parents within 30 days of the receipt of the complaint," the parents are entitled to an "impartial due process hearing" conducted by either the school district or the relevant state educational agency. 20 U.S.C. §§ 1415(f)(1)(B)(ii), 1415(f)(1)(A).

In Massachusetts, in accord with the IDEA's established framework for considering parent complaints, the "impartial due process" hearing is conducted by the BSEA. See 20 U.S.C. § 1415(f)(1)(A); Mass. Gen. Laws ch. 71B, § 2A(a); 603 Mass. Code Regs. 28.08(3)-(6). Further, parents who are dissatisfied with the IEP provided to their child may "unilaterally" place their child at a private school "during the pendency of review proceedings." Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 373-74 (1985). But, the parents make that decision "at their own financial risk." Id. at 374. The parents may request that the state educational agency order the school district to

reimburse them for expenses resulting from the unilateral placement of their child, but the state educational agency is not required to do so unless it finds that the school district "had not made a free appropriate public education available to the child in a timely manner" prior to the unilateral placement. 20 U.S.C. § 1412(a)(10)(C)(ii).

Under the IDEA, if the state educational agency renders a decision adverse to either the parents or the school district, either party may "bring a civil action challenging the outcome of the due process hearing in either state or federal court." Johnson, 906 F.3d at 186; see 20 U.S.C. § 1415(i)(2)(A); 603 Mass Code Regs. 28.08(6). In conducting its review, the court in that civil action must consider the "records of the administrative proceedings," as well as "additional evidence at the request of a party." 20 U.S.C. §§ 1415(i)(2)(C)(i)-(ii).

We have described a district court's review of the state administrative ruling as entailing "involved oversight" of the agency's factual findings and conclusions. S. Kingstown Sch. Comm. v. Joanna S., 773 F.3d 344, 349 (1st Cir. 2014). The district court, in demonstrating respect for the state administrative agency's expertise as to educational and pedagogical matters, must accord "due weight" to the agency's administrative proceedings. Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1087 (1st Cir. 1993) (quoting Bd. of Educ. of Hendrick Hudson

Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206 (1982)); see id. ("Although the exact quantum of weight is subject to the district judge's exercise of informed discretion, the judge is not at liberty to [ignore] administrative findings or to discard them without sound reason."). Then, "basing its decision on the preponderance of the evidence," the district court "shall grant such relief as [it] determines [is] appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii).[1] The court tasked with reviewing the outcome of a due process hearing may order that the school district reimburse the parents for expenses arising from unilateral placement of their child at a private school, but the federal court may do so only if it "concludes both that the public placement violated IDEA and that the private school placement was proper under the Act." Florence Cty. Sch. Dist. Four v. Carter, 510 U.S. 7, 15 (1993).

**B.**

We now "set forth the background facts" for the case at hand "as supportably found by the [D]istrict [C]ourt." Sebastian M., 685 F.3d at 82. We then describe the relevant procedural history.

---

[1] In civil actions of this sort, a motion for summary judgment is "'simply a vehicle' for providing review of the underlying administrative ruling." Joanna S., 773 F.3d at 349 (quoting Sebastian M. v. King Phillip Reg'l Sch. Dist., 685 F.3d 79, 84 (1st Cir. 2012)).

**1.**

G.D. is an eleven-year-old child and a resident of Swampscott, Massachusetts. She is eligible to receive special education services from her school district, Swampscott Public Schools, on account of her learning disabilities, which include severe dyslexia, dysgraphia, and a phonological processing disorder. G.D. attended a local private school for kindergarten and first grade. She did not receive any specialized services at the private school.

G.D.'s parents grew concerned during her first-grade year about her lack of early reading and writing skills. As a result, in April 2017, G.D's parents referred their child to her school district for an evaluation to determine whether she was eligible for special education services.

With the consent of G.D.'s parents, and while she was still attending private school, the school district conducted psychological and academic assessments of G.D. The school district determined that G.D. was eligible to receive special education services due to a learning disability that affects her reading, writing, and mathematics abilities.

The school district convened a meeting to discuss the result of the evaluations between G.D.'s parents, teachers who would provide the special education services set forth in the proposed IEP, and representatives from the school district. At

that June 7, 2017 meeting, the parents asserted that an appropriate response to the disabilities identified in the school district's assessment would involve a "science-based academic program for dyslexic students." They also asserted that "neither [G.D.'s current] private school nor [the school district] was equipped to provide appropriate services for" their daughter. Accordingly, the parents requested that G.D. be placed at a "substantially-separate school" for children with language-based disabilities. The school district rejected this request, and proposed an IEP for her second-grade year on June 20, 2017.

The proposed IEP offered G.D. special education services that would be provided to her five times a week during the school year and four times a week during the preceding summer.[2] The June 2017 IEP indicated that, during the school year, G.D. would receive the designated services in a partial inclusion placement at an elementary school within the school district, meaning that she would receive some specialized instruction in a "language-based classroom," and "inclusion support in other subjects in the general

---

[2] The proposed IEP established various goals for G.D. to accomplish during her second-grade year, such as her "decoding and encoding [of] closed one-syllable words and identification of sight words; a reading goal focusing on fluency and comprehension; a written language goal to teach [G.D. how] to write a simple story with complete sentences and correct capitalization and punctuation; and a math goal addressing addition/subtraction facts, telling time, identifying money, use of graphs and charts, and solving word problems."

education setting." The IEP also provided that G.D. would receive an "extended evaluation" during the first eight weeks of her second-grade year.

Later that month, G.D.'s parents sent a letter to the school district that indicated their intention to "conditionally accept" the proposed IEP and the placement corresponding to it, despite their view that the IEP was not sufficient to allow G.D. to make effective progress. The parents also indicated that they would arrange to have a private specialist, Dr. Robert Kemper, evaluate G.D. during the summer, and they requested that the results of the specialist's evaluation be discussed at the next convened meeting in October.

During the summer, G.D. received the "extended year" reading instruction services that were provided for in the IEP. Those services consisted of two forty-five-minute sessions each week of reading instruction from special education teachers. And after G.D. had completed her summer instruction, Dr. Kemper conducted his planned evaluation of G.D. The evaluation involved Dr. Kemper's administration of tests designed to assess oral and written language skills. Based on this testing, Dr. Kemper determined that G.D. met the criteria for diagnoses of dyslexia, "double deficit" phonological processing disorder, dysgraphia, and a language impairment that impacted G.D.'s ability to convey her thoughts orally and in writing. Dr. Kemper also "strongly

recommended" that G.D.'s "special education services be provided within . . . a substantially separate educational program . . . housed within . . . a school that is designed specially to meet the needs of students such as [G.D.] who demonstrate severe language-based learning disabilities."

G.D.'s second-grade year began in late-August 2017. Pursuant to the IEP, G.D. "participated in a general education class at [the school district] with support for science, social studies and non-academic activities," and separated from the general education class for a part of the school day "to work on [reading, writing, and math] skills in individual or small group sessions with a special education teacher." G.D. ex rel. Jeffrey D. v. Swampscott Public Schools, No. 19-cv-10431, 2020 WL 3453172, at *2 (D. Mass. June 23, 2020). In November, Dr. Kemper conducted a re-evaluation of G.D. to measure progress in her reading and writing skills using several of the same assessments that he had administered to G.D. in August.

Some of G.D.'s assessment scores did not increase; others increased somewhat, but Dr. Kemper opined that the increase was not enough to demonstrate "statistically significant" improvement. Dr. Kemper concluded that G.D.'s assessment scores provided "no evidence of effective progress" resulting from the three months of instruction and special education services that G.D. received from Swampscott as a result of the IEP. He further

- 10 -

concluded that it was "extremely critical that [G.D.] be placed in an alternative education setting as soon as possible."

The school district then held another meeting on November 21, 2017 to discuss the results of Dr. Kemper's evaluation. At that meeting, the school district proposed an amendment to the IEP that would place G.D. in "a substantially separate language-based classroom" instead of the previous placement, under which G.D. had received instruction in a general education class for the bulk of the school day but also received "specialized, pull-out individual or small group instruction" from special education teachers. G.D.'s parents initially rejected this proposed amendment to the IEP. In January 2018, however, the parents accepted the amendment after Swampscott proposed it as part of an eight-week "extended evaluation" of G.D.

In March 2018, at the conclusion of the "extended evaluation" period, the school district administered to G.D. several formal and informal assessments to measure her progress since the beginning of the school year.[3] According to the school district, those assessments demonstrated that G.D. was "improving her oral reading fluency," and "making progress in writing using graphic organizers, templates, and word processing programs." A quarterly progress report, issued by G.D.'s teachers at her public

_____

[3] The school district previously administered these assessments to G.D. at different points in 2017.

- 11 -

school in the school district in the same month, noted that G.D. was "making progress" on the goals identified in her IEP.

Around the time of this evaluation, G.D.'s parents submitted an application for their daughter's admission to Landmark School ("Landmark"), a private school that specializes in the instruction of, and exclusively teaches, schoolchildren with learning disabilities. As part of the application process, Landmark administered standardized tests to G.D. to measure her reading and writing abilities, as well as her learning aptitude. Landmark accepted the application shortly thereafter.

Later in the month, the school district convened another meeting with G.D.'s parents to discuss the results of its "extended evaluation" of G.D., a report from Dr. Kemper concerning G.D.'s progress, and progress reports from G.D.'s teachers at her local public school. At the meeting, the school district shared its view that G.D. was making progress due to the services that she received in her new placement and proposed that the placement continue beyond the "extended evaluation" period on which the school district and the parents had earlier agreed.

G.D.'s parents expressed their view that G.D. was not making "effective progress [in the placement], that she in fact had regressed, and needed an outside placement." G.D.'s parents also informed the school district of G.D.'s acceptance at Landmark and stated their intention to "unilaterally place" G.D. at Landmark

for the upcoming school year.  In addition, they informed the school district that they would seek reimbursement from the school district for expenses associated with G.D.'s placement at Landmark and would seek a due process hearing before the BSEA to secure such reimbursement.[4]

Three days after the meeting, G.D.'s parents sent to the school district a letter that stated their intention to unilaterally place G.D. at Landmark and to seek "full reimbursement of all costs related to [G.D.'s] enrollment at Landmark."  One week after sending that letter, G.D.'s parents submitted a hearing request to the BSEA.

**2.**

The hearing request alleged, among other things, that the school district had denied G.D. a FAPE because it had "failed to deliver to [G.D.] the services set forth in her 2017-2018 IEP;" that the IEP had "caused regression for [G.D.] and has not resulted in effective progress;" that "the proposed IEP and placement fails to promote [G.D.'s] development in all areas of need;" and that the IEP was not "appropriately ambitious and lack[ed] measurable goals related to [r]eading."  The parents requested "an appropriate

_____

[4]     As to the school district's newly proposed IEP, the parents rejected it in part on the view that it was inappropriate and insufficient given G.D.'s needs, but accepted it for the purpose of implementation only for the remainder of the school year.

- 13 -

placement for [G.D.] within the least restrictive environment to address [G.D.'s] unique needs, by providing the consistent out-of-district placement at a school that parents deem appropriate for [G.D.] (which parents and child's providers maintain is appropriate for [G.D.] like Landmark School)." They also requested that the school district "be required to fund [G.D.'s] out of district tuition, transportation, mandatory fees and activity expenses, and mandatory hardware expenses."

The BSEA hearing took place over an eight-day period between June and October 2018. In the interim, G.D.'s parents enrolled their daughter at Landmark for summer instruction and for the subsequent school year. At the conclusion of the BSEA hearing in October, G.D. had received 24 days of instruction in Landmark's summer program, and approximately one month of schooling in Landmark's academic year program.

The BSEA hearing officer issued her decision on December 10, 2018. The hearing officer viewed the record before her as presenting a "close case" but concluded that G.D.'s parents failed to prove by a preponderance of the evidence that the IEPs provided by the school district were not reasonably calculated to provide G.D. with a free appropriate public education, and that, as a consequence, the school district was not required to reimburse G.D.'s parents for the cost of their unilateral placement of G.D. at Landmark.

After receiving the BSEA hearing officer's decision, G.D.'s parents, on March 8, 2019, filed a pro se complaint in the United States District Court for the District of Massachusetts as permitted under the IDEA. See 20 U.S.C § 1415(i)(2)(A). The complaint named the school district and the BSEA as defendants and sought a declaration from the District Court that the BSEA erred in its determination that G.D.'s IEP was reasonably calculated to provide her with a FAPE. The parents also sought an order from the District Court directing the school district to reimburse them for the costs of sending G.D. to Landmark. The District Court thereafter denied the parents' motion for summary judgment and entered judgment in favor of the defendants. See Swampscott, 2020 WL 3453172. This appeal followed.

## II.

G.D.'s parents first challenge the District Court's reliance in granting judgment to the defendants on the BSEA's finding that G.D. had made "slow gains" under the IEP. The parents do not suggest that a finding of "slow gains" is categorically incapable of supporting the rejection of a challenge to an IEP under the IDEA for failing to provide a child with a FAPE. They instead press a more limited contention based on the Supreme Court's recent decision in Endrew F., 137 S. Ct. at 999, which they contend permits a "slow gains" finding to provide a basis for

rejecting such a challenge only when the rejection based on that finding is tied to the child's "particular circumstances."

The argument by G.D.'s parents based on Endrew F. appears to be in part that the District Court mistakenly held that the BSEA was not required to make findings about G.D's individual circumstances in relying on her IEP-based "slow gains" to reject the parents' IDEA claims. But, even assuming we must review this determination de novo as a question of law, it is without merit, as the record shows that the District Court did not make the claimed mistake. Rather, it explained that "the [BSEA] Hearing Officer concluded that the goals included in the IEPs for G.D. and the progress that G.D. made towards achieving those goals were appropriate in light of G.D.'s circumstances." Swampscott, 2020 WL 3453172, at *5 (emphasis added); see also C.D. ex rel. M.D. v. Natick Pub. Sch. Dist., 924 F.3d 621, 629 (1st Cir. 2019) ("Under both Endrew F. and our precedent, a court evaluating whether [the] IEP offers a FAPE must determine whether the IEP was reasonably calculated to confer a meaningful educational benefit in light of the child's circumstances.").

G.D.'s parents also appear to be arguing, in the alternative, that the District Court erred in light of Endrew F. because the BSEA did not in fact premise its finding regarding the import of G.D'S "slow gains" on her individual circumstances. But, this contention also lacks merit.

- 16 -

The BSEA explained that:

> [A]fter arriving in Swampscott as a non-reader . . . [G.D.] acquired some phonemic awareness skills . . . progressed from being unable to blend syllables or recognize vowels, to being able to identify some syllable types and digraphs, and from being able to read only at a mid-kindergarten level when she entered SPS in August 2017 to being able to read a Grade 1-level text by January 2018. During 2017-2018 [G.D.] acquired knowledge of word sounds and recognized increasing numbers of sight words. . . . There is no dispute that with support, [G.D.] acquired new math skills. With accommodations for her reading and writing deficits, there was no evidence that [G.D.] could not absorb second-grade content in science and social studies.

This passage leads us to conclude that the BSEA impliedly tied its consideration of G.D's "slow gains" to its discussion of the goals set out for G.D. in her IEPs, see Swampscott, 2020 WL 3453172, at *5, and that it did so by assessing those gains with reference to her not having had the benefit of any special education services in kindergarten and first grade, when she had attended a private school. Id. We thus do not see how the parents' assertion that the BSEA failed to account for G.D.'s individual circumstances holds, notwithstanding that the BSEA did not state expressly the need to account for her individual circumstances in making the requisite tie.

# III.

The parents next contend that the District Court erred by relying on "informal" evidence of G.D.'s "slow gains" under the IEP to reject their IDEA claims that the BSEA erred in finding that G.D. received a FAPE when "uncontroverted standardized testing" showed that G.D. failed to improve her performance on such tests while receiving the services prescribed by her IEP. The parents' argument proceeds as follows: the IDEA requires that a school district must "meet the standards of the State educational agency" in providing a FAPE to an eligible student, 20 U.S.C. § 1401(9)(B); Massachusetts relies on standardized testing -- the Massachusetts Comprehensive Assessment System exams -- in measuring educational progress, see 603 Mass. Code Regs. 30.02, 30.03; such testing in Massachusetts constitutes "the standards of the State educational agency;" in determining whether the school district provided G.D. with a FAPE, the BSEA and the District Court were required to rely on her progress based on her performance on what the parents refer to as "standardized tests" rather than on the more qualitative assessments of her progress under the IEP that the school district administered and on which the BSEA and the District Court in fact relied; and, finally, those standardized tests revealed that G.D.'s performance on them had not improved. As this question concerns the proper interpretation of 20 U.S.C.

§ 1401(9)(B), a provision of the IDEA, our review is de novo.  See Lenn, 998 F.2d at 1087.

The District Court noted, however, that the parents offered no authority to support the proposition that an IEP -- for purposes of determining whether she received a FAPE -- "only must be measurable through standardized testing evidence to be considered appropriate."  Swampscott, 2020 WL 3453172, at *5.  Nor have they done so on appeal.  Moreover, the parents do not challenge the BSEA's finding, which the District Court also invoked, that "there is no credible, reliable information in the record about how much growth in standardized test scores during the time period in question would be required to demonstrate 'effective progress' for [G.D.]."  Id.  Instead, they contend only that because standardized testing is relied on by Massachusetts as a general matter, evidence that a child has made no progress on those tests while receiving the services provided for in her IEP must suffice to show that she has not received the kind of progress necessary to show that she is receiving a FAPE, regardless of the other evidence of her having made "effective progress" under the IEP that is in the record.

But, a child receives a FAPE if a school district offers her "an IEP that is reasonably calculated to enable [her] to make progress appropriate in light of [her] circumstances."  Endrew F., 137 S. Ct. at 999.  A standardized test is, by definition, designed

to measure a child's progress without regard to her individual circumstances, let alone with regard to the individual circumstances for that child identified in her IEP. See, e.g., Indep. Sch. Dist. No. 283 v. E.M.D.H., 960 F.3d 1073, 1082 (8th Cir. 2020); William V. ex rel. W.V. v. Copperas Cove Indep. Sch. Dist., 826 Fed. App'x 374, 379 (5th Cir. 2020); F.L. v. Bd. of Educ. of Great Neck Union Free Sch. Dist., 735 Fed. App'x 38, 40 (2d Cir. 2018); cf. Doe v. Cape Elizabeth Sch. Dist., 832 F.3d 69, 81 (1st Cir. 2016) (noting that a child's "generalized academic performance," such as performance reflected on a standardized assessment, may "contradict[] the results of" assessments that are specifically tailored for a child). Thus, absent some evidence -- which the BSEA found to be lacking and which the parents do not identify as being present in the record -- as to "how much growth in standardized test scores during the time period in question would be required to demonstrate 'effective progress' for [G.D.]," Swampscott, 2020 WL 3453172, at *5, it is not evident to us how the BSEA erred in relying on the informal assessments showing G.D. to have made "slow gains" under her IEP to arrive at its finding that the parents failed to meet their burden to show that she had not received a FAPE, at least given that, as we have explained, that "slow gains" finding was based on a consideration of G.D.'s individual circumstances.

G.D.'s parents also argue that the District Court erred along a number of distinct dimensions with respect to its treatment of evidence that concerned G.D.'s progress at Landmark. Here, too, we disagree.

**A.**

The parents' first contention on this score is that the District Court erred in not permitting the introduction of evidence about G.D.'s progress at Landmark that arose after the BSEA hearing concluded. The parents contend that the District Court's allowance of the introduction of the earlier Landmark-related evidence renders arbitrary the exclusion of that later Landmark-related evidence. Our review is for abuse of discretion. See Roland M. v. Concord Sch. Comm., 910 F.2d 983, 997 (1st Cir. 1990).

The District Court's differing treatment of pre- and post-hearing Landmark-related evidence reflects a reasonable assessment of the different nature of those two categories of evidence. The former category of Landmark-related evidence arose before the conclusion of the BSEA hearing in October 2018 and so constituted evidence that the District Court could have reasonably determined that the BSEA itself was obliged to consider. The post-hearing evidence, by contrast, arose only after the BSEA had concluded its proceedings and so is not evidence of that kind. Thus, the mere fact that the District Court treated these two

tranches of Landmark-related evidence differently does not show that the District Court abused its discretion in denying the admission of the Landmark-related evidence that arose after the conclusion of the BSEA hearing.

The parents do also contend that the post-hearing, Landmark-related evidence that was excluded by the District Court could still have been admissible, despite its late-arising character, because it could show how the school district's actions in formulating and administering the IEP at issue "were objectively unreasonable from the outset," such that they had denied her the FAPE to which the IDEA entitled her. But, even assuming that is so, the District Court held here that the Landmark-related evidence could not show that the school district's actions with respect to the IEP for G.D. were objectively unreasonable.

As the District Court explained, insofar as G.D. did make progress at Landmark, she did so in an educational environment specifically tailored exclusively for students with special education needs, whereas, at her local public school, G.D., while receiving the services under her IEP, also "participated in a general education class for certain subjects." Swampscott, 2020 WL 3453172, at *7. We understand the District Court to have reasoned in this regard that, given the IDEA's preference for "educating students with disabilities in general-education settings," id. (internal quotation marks and citations omitted),

- 22 -

a comparison between the progress that G.D. made at Landmark with her progress at her local public school would not reveal that she had not received a FAPE, see C.G. ex rel. A.S. v. Five Town Cmty. Sch. Dist., 513 F.3d 279, 284-85 (1st Cir. 2008) (noting that "[i]t is common ground that the IDEA manifests a preference for mainstreaming" students with special needs); Roland M., 910 F.2d at 992-93 ("Mainstreaming may not be ignored, even to fulfill substantive educational criteria."). As the parents do not develop any argument as to how the District Court erred in so determining, we cannot say that the record compels the conclusion that it clearly erred in making that determination.[5]

**B.**

The parents further contend that the Landmark-related evidence presented to the District Court demonstrates that G.D. made "swift, significant, and quantifiable progress" there and thus, per C.B. ex rel. B.B. v. Special School District No. 1, Minneapolis, Minnesota, 636 F.3d 981 (8th Cir. 2011), that the IEP instituted by the school district was not reasonably calculated to

---

[5] On this basis, we also reject the parents' argument that the District Court abused its discretion in denying them an evidentiary hearing as to the admissibility of the pre-hearing, Landmark-related evidence. For, as the District Court noted in its memorandum opinion, even if that evidence was deemed to be "admissible and could be said to support Plaintiffs' contention that G.D. made progress at Landmark," it still would not support the conclusion that the school district's IEP was inadequate and that the school district failed to provide G.D. with a FAPE. Swampscott, 2020 WL 3453172, at *7.

- 23 -

enable G.D. to make appropriate progress in that school setting. But, in C.B. ex rel. B.B., the school district was put on notice that the child's reading abilities improved due to the use of an alternative teaching method and nonetheless declined to consider or implement that alternative teaching method in a successive IEP. See 636 F.3d at 984. Here, by contrast, the school district correctly points out that it did not have access to information concerning G.D.'s progress at Landmark at the time that it formulated the March 2018 IEP that is at issue, because the progress itself post-dated the formulation of that IEP. See Roland M., 910 F.2d at 992 ("An IEP is a snapshot, not a retrospective. In striving for 'appropriateness,' an IEP must take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was promulgated."). Thus, we are not persuaded by the parents' attempt to challenge based on C.B. ex rel. B.B. the conclusion that the IEP was not reasonably calculated to provide G.D. with a FAPE.

## V.

For the foregoing reasons, we affirm the District Court's grant of judgment to the defendants.