# United States Court of Appeals
## For the First Circuit

No. 15-1155

MR. AND MRS. DOE,

Plaintiffs, Appellants,

v.

CAPE ELIZABETH SCHOOL DISTRICT,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Jon D. Levy, U.S. District Judge]

Before

Barron, Selya, and Lipez,
Circuit Judges.

Richard O'Meara, with whom Kaitlyn M. Wright and Murray, Plumb & Murray were on brief, for appellant.
Eric R. Herlan, with whom Erin R. Feltes and Drummond Woodsum & MacMahon were on brief, for appellee.
Amy Phalon and Gibbons Stevens Law Office on brief for amici curiae International Dyslexia Association et al.
Ellen Saideman, Law Office of Ellen Saideman, Selene Almazan-Altobelli, and Council of Parent Attorneys and Advocates on brief for amicus curiae Council of Parent Attorneys and Advocates.

August 5, 2016

**LIPEZ**, **Circuit Judge**. This case raises an important issue regarding eligibility for special education under the Individuals with Disabilities Education Act ("IDEA"). We are asked, in essence, to decide whether a child with a strong academic record may still be found to have a learning disability and a need for special education, thereby entitling her to special education and related services.

Appellants Mr. and Mrs. Doe ("the Does") appeal the decision of the district court, which affirmed the administrative hearing officer's determination that their child, Jane Doe ("Jane"), is no longer eligible to receive special education under the IDEA despite allegedly suffering from a reading fluency deficit. The Does argue that the district court erred as a matter of law in its eligibility inquiry because (i) the court considered Jane's overall academic achievement, when her deficiency in reading fluency is sufficient by itself to support eligibility, and (ii) the district court did not make an independent judgment as to Jane's reading fluency deficit, instead deferring to the hearing officer's factual findings, while summarily dismissing the additional evidence that the Does submitted.

Having carefully considered the claims, we conclude that, while Jane's overall academic performance could potentially be relevant in determining whether she has a reading fluency deficit, the district court erred in relying on such evidence

without regard to how it reflects her reading fluency skills. Additionally, we find that the court failed to make an independent judgment as to the additional evidence submitted by the Does and afforded excessive deference to the hearing officer's determinations in weighing the relevant reading fluency measures. Hence, we vacate and remand the case.

We clarify, however, that even if the district court finds on remand that Jane has a reading fluency deficit, she would not be eligible for special education unless she also "needs" special education. In assessing that need, grades and standardized test results are not categorically barred from consideration any more than they are categorically barred under the first prong inquiry, so long as they were determined to be relevant in discerning a learning disability.

## I.

The factual and procedural history of this case is informed by the statutory framework governing the eligibility inquiry and judicial review of administrative decisions. We thus preface our discussion of the facts with a brief overview of the relevant statutory regime.

### A. Legal Background

The IDEA was enacted to provide "free appropriate public education" to children with disabilities. 20 U.S.C. § 1400(d)(1)(A). Pursuant to this objective, the statute mandates

that states receiving federal funds under the statute provide "special education and related services" to students who qualify as children with disabilities. Id. §§ 1401(3)(A)(ii), 1412(a)(1)(A). All determinations regarding eligibility for special education are hence governed, in the first instance, by the definition of a "child with a disability." See id. § 1401(3)(A). A "child with a disability" is a child:

> (i) with intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance (referred to in this chapter as "emotional disturbance"), orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and

> (ii) who, by reason thereof, needs special education and related services.

Id.

Accordingly, eligibility determinations proceed in two steps. The first prong determines the existence of a disorder[1] -- here, a specific learning disability ("SLD"). Id. § 1401(3)(A)(i). The second prong identifies whether the child

---

[1] In this opinion, we use the term "disorder," in addition to the term "disability," to refer to one of the qualifying disabilities under 20 U.S.C. § 1401(3)(A)(i). By contrast, we refer to a child who has one of the qualifying disabilities under § 1401(3)(A)(i) but who has not yet satisfied the "need" prong as a "child with a disorder" -- distinguished from a "child with a disability," a term that is defined under the statute to refer to a child who has satisfied both the first and second prongs of the eligibility inquiry.

- 4 -

with a qualifying disorder "needs" special education and related services as a result of that disorder.  Id. § 1401(3)(A)(ii).

Regulations promulgated by the U.S. Department of Education ("U.S. DOE") provide further guidance on how to identify a child with an SLD.  An SLD is "a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations, including conditions such as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia."  34 C.F.R. § 300.8(c)(10)(i).  A child has an SLD if:

> (1) The child does not achieve adequately for the child's age or [] meet State-approved grade-level standards in one or more of the following areas, when provided with learning experiences and instruction appropriate for the child's age or State-approved grade-level standards:
> (i) Oral expression.
> (ii) Listening comprehension.
> (iii) Written expression.
> (iv) Basic reading skill.
> (v) Reading fluency skills.[2]

---

[2] "Reading fluency" -- the area in which Jane is alleged to have a deficit -- is not defined in the statute or in the agency regulations.  The Does define the term as "the combination of the rate and accuracy with which one can decode words in passages." The Cape Elizabeth School District does not object.  We find this definition appropriate and rely on it for reference.  See also Br. of Int'l Dyslexia Ass'n et al. as Amici Curiae at 9 (defining "reading fluency" as "the ability to read a text quickly, accurately, and with proper expression"); James S. v. Town of Lincoln, No. CA 11-236 ML, 2012 WL 3645339, at *3 (D.R.I. Aug. 23,

         (vi) Reading comprehension.
         (vii) Mathematics calculation.
         (viii) Mathematics problem solving.
    [and]

    (2)(i) The child does not make sufficient
    progress to meet age or State-approved grade-
    level standards in one or more of the areas
    identified in paragraph (a)(1) of this section
    when using a process based on the child's
    response to scientific, research-based
    intervention; or

    (ii) The child exhibits a pattern of strengths
    and weaknesses in performance, achievement, or
    both, relative to age, State-approved grade-
    level standards, or intellectual development,
    that is determined . . . to be relevant to the
    identification of a specific learning
    disability, using appropriate assessments,
    consistent with §§ 300.304 and 300.305.

Id. §§ 300.309(a)(1), (a)(2)(i)-(ii).[3]

    Once a child is determined to have an SLD, the

eligibility inquiry asks whether the child also "needs special

education and related services" "by reason [of]" her disability.

20 U.S.C. § 1401(3)(A)(ii).  "Special education" is defined as

_____

2012) (understanding "reading fluency" under the IDEA as a
measurement of "speed and accuracy").

    [3] It is undisputed that Jane meets the second criterion for a
cognizable SLD because she "exhibits a pattern of strengths and
weaknesses" in the relevant performance and achievement areas.  34
C.F.R. § 300.309(a)(2)(ii).  We also note that there is a third
criterion for an SLD, which provides that "findings under [the
first two criteria]" must not be "primarily the result of (i) A
visual, hearing, or motor disability, (ii) Mental retardation,
(iii) Emotional disturbance, (iv) Cultural factors, (v)
Environmental or economic disadvantage, or (vi) Limited English
proficiency." Id. § 300.309(a)(3).  The parties have not addressed
this requirement, however, and we assume that it has been met.

- 6 -

"specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability, including . . . instruction conducted in the classroom, in the home . . . and in other settings," as well as "instruction in physical education." Id. § 1401(29). "Related services" means "transportation, and such developmental, corrective, and other supportive services (including . . . psychological services, physical and occupational therapy, . . . medical services . . . ) as may be required to assist a child with a disability to benefit from special education." Id. § 1401(26)(A). Neither the statute nor the agency regulations specifies the object or the scope of the need determination.

## B. Factual Background[4]

As early as preschool, Jane struggled with reading and learning to talk. When she was in second grade in the Cape Elizabeth School District ("school district"), Jane's Individualized Education Program team ("IEP team") -- which included her parents and teachers (among other individuals), see id. § 1414(d)(1)(B) -- concluded that Jane was eligible to receive special education under the IDEA as a student with an SLD based on her deficiency in reading fluency. Jane's IEP team thus developed an Individualized Education Program ("IEP") to provide Jane with

_____

[4] We draw these facts primarily from the hearing officer's findings.

specialized instruction to improve her reading fluency skills. As a bright, hard-working student with dedicated parents, Jane improved her reading skills over the years, and she continued to perform well in school, as well as on standardized tests.

In March 2012, when Jane was in seventh grade, her IEP team decided to place her on consult status for the remainder of the year, based on the fact that she was achieving well in school, including in the area of reading fluency. Although the Does did not object, they expressed a concern that Jane might regress without specialized instruction. To address this concern, the IEP team agreed to administer monthly reading fluency probes[5] to monitor Jane's fluency skills. Since March 2012, Jane has not received any special education.

In January 2013, Jane's IEP team decided that she no longer qualified as a student with an SLD because, among other reasons, she was achieving adequately in all areas, including reading fluency, even without special education, and hence did not have a cognizable learning disability under federal and state laws. Among the factors considered by the IEP team was Jane's excellent academic record, as demonstrated by her straight-A grades and her performance on generalized state standardized tests, such as NECAP

---

[5] According to the hearing officer, reading fluency probes are "'cold reads,' in which the [child] [is exposed to the reading prompt for the first time when she [i]s asked to read it."

(New England Common Assessment Program) and NWEA (Northwest Evaluation Association) exams. The IEP team also took into account the results of tests that were administered specifically to measure Jane's reading skills, such as TOWRE-2 (Test of Word Reading Efficiency), WMRT-III (Woodcock Reading Mastery Tests), GORT-5 (Gray Oral Reading Test), and TOC (Test of Orthographic Competence). Jane scored above average or in the average range in almost all the areas in which she was tested, including reading fluency. The team also considered Jane's social and behavioral life in school, as observed by her teachers, school psychologist, parents, and herself.

The Does disagreed with the school's eligibility decision and sought a third-party evaluation from Victoria Papageorge, an educational consultant, and Dr. Richard Doiron, a neuropsychologist. Papageorge administered many of the tests that overlapped with those already considered by the IEP team, such as TOWRE-2, WRMT-III, and GORT-5. While Jane's scores on WRMT-III and GORT-5 were comparable to those achieved when she was tested by the school, she scored considerably lower on TOWRE-2 when it was administered by Papageorge. Papageorge also administered an additional reading test, the Symbolic Imagery Test, on which Jane scored very low. Doiron administered, among others, the Nelson Denny Test, which counts the number of words read in a given time period, and Jane scored low on the reading rate component of that

test. Papageorge and Doiron wrote a report based on the test results.

In May 2013, Jane's IEP team reconvened to consider Jane's eligibility in light of the third-party evaluation. The IEP team again determined that Jane was not eligible to receive special education because she was performing adequately in all areas, thus indicating the absence of an SLD under federal and state laws.

## C. Procedural Background

The IDEA provides for administrative and judicial review of the IEP team's and the hearing officer's decisions, respectively, regarding a child's eligibility for special education. Under the statute, parents who disagree with the IEP team's eligibility determinations can file a complaint for an "impartial due process hearing" conducted by a local or state educational agency official, i.e., a "hearing officer." 20 U.S.C. § 1415(f); see 34 C.F.R. § 300.507(a)(1). The hearing officer's decision is then subject to judicial review. See 20 U.S.C. § 1415(i)(2). Under the subheading "Right to bring civil action," the IDEA provides that a reviewing court: "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant

such relief as the court determines is appropriate." Id. § 1415(i)(2)(C).

After Jane's IEP team decided that she no longer qualified as a student with an SLD, the Does sought administrative review of the school's decision. In making the eligibility determinations, the hearing officer considered a broad base of measures, including Jane's excellent grades, standardized test results, classroom performance, and general school life, based on input from her teachers and parents, as well as the results of tests that specifically measured her reading fluency skills. The hearing officer then affirmed the school's decision to deny eligibility because Jane was achieving adequately in all areas and hence did not have an SLD. The hearing officer also found that Jane did not need special education to benefit from the school program.

The Does then brought this civil action. Pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii), the Does submitted post-hearing "additional evidence" that consisted of an affidavit attesting to their observations of Jane's continuing struggles with reading fluency. The affidavit also contained the results of the more recent reading fluency probes, which the Does argued were more reflective of Jane's reading fluency deficit than the older reading fluency probes that were before the hearing officer. The district court noted that the reading fluency probes received "scant

consideration" from the hearing officer. It then largely adopted the administrative officer's findings regarding Jane's performance on reading fluency measures. The court concluded -- in affirmance of the hearing officer's (and the IEP team's) decision -- that Jane did not have an SLD and thus was not eligible to receive special education under federal and state laws. The district court did not address whether Jane needed special education under the second prong of the eligibility inquiry. This appeal followed.

## II.

The Does contend that the district court erred in considering Jane's overall academic achievement because a deficiency in reading fluency alone can support eligibility under the IDEA. Additionally, a reading fluency deficit, the Does argue, can only be measured by specific reading fluency assessments, such as TOWRE-2, WRMT-III, GORT-5, and the reading fluency probes, and not by a child's overall academic performance, such as Jane's school grades and NECAP and NWEA scores. They argue that these reading fluency measures indicate that Jane has a reading fluency deficit, and that she needs special education to address it.

We conduct de novo review for questions of law addressed by the district court and clear error review for the court's findings of facts. Where the case raises mixed questions of law and fact, we employ a "degree-of-deference continuum," providing "non-deferential plenary review for law-dominated questions" and

"deferential review for fact-dominated questions." <u>Mr. I. ex rel.</u>
<u>L.I.</u> v. <u>Me. Sch. Admin. Dist. No. 55</u>, 480 F.3d 1, 10 (1st Cir.
2007) (citation omitted)).

## A. First Prong of the Eligibility Inquiry

The district court considered Jane's overall academic
achievement under the first prong of the eligibility
determinations, i.e., in identifying an SLD.[6] A child has an SLD
if he or she "does not achieve adequately for the child's age" or
"meet State-approved grade-level standards in one or more of the
following areas." 34 C.F.R. § 300.309(a)(1). "Reading fluency
skills" is one of the eight areas listed, along with "basic reading
skill" and "reading comprehension." <u>Id.</u> § 300.309(a)(1)(iv), (v),
(vi).

---

[6] We note that the definitions of most other disabilities
listed in 20 U.S.C. § 1401(3)(A)(i) -- the first prong of the
"child with a disability" definition -- contain the requirement
that the disability "adversely affect[] a child's educational
performance." 34 C.F.R. § 300.8(c)(1), (3)-(5), (8)-(9), (11)-
(13). Accordingly, courts addressing other disabilities that
contain the "adversely affect" requirement have considered a
child's academic record under that phrase. <u>See</u> <u>Mr. I. ex rel.</u>
<u>L.I.</u>, 480 F.3d at 11; <u>J.D. ex rel. J.D.</u> v. <u>Pawlet Sch. Dist.</u>, 224
F.3d 60, 65-67 (2d Cir. 2000). The definition of "specific
learning disability," by contrast, does not include the "adversely
affect" language. 34 C.F.R. § 300.8(c)(10). The parties have not
addressed this distinction among the disability terms, nor do we
discern here an explanation for the omission of the "adversely
affect" language in the SLD definition. Hence, while we hold in
this case that a child's academic performance may be a factor where
it is relevant to his or her area of deficiency, we do not base
our interpretation on the language of the SLD definition.

The conjunctive phrase, "in one or more . . . areas," combined with the fact that "reading fluency" is listed as a separate category from two other reading-related skills, makes clear that a reading fluency deficit is sufficient to support a cognizable SLD. Id. § 300.309(a)(1). There is a separate question, however, regarding what assessments and measures may be considered in determining a reading fluency deficit. In answering this question, we conclude that a child's overall academic performance may be a relevant factor, insofar as it serves as a fair proxy of his or her reading fluency skills.

First, the agency regulations uniformly indicate that the eligibility inquiry, generally, must take into account a broad base of measures, including a child's academic performance.[7] The

---

[7] We find that the agency regulations and letters cited herein command deference in light of the ambiguities in the statutory provisions governing the eligibility inquiry. See, e.g., 20 U.S.C. § 1401(3)(A). In Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, 467 U.S. 837, 843 (1984), the Supreme Court held that, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Indeed, such deference is warranted even when an agency expresses its view through an informal means, rather than by exercising its rulemaking authority. See Chase Bank USA N.A. v. McCoy, 562 U.S. 195, 208-09 (2011); Capistrano Unified Sch. Dist. v. Wartenberg, 59 F.3d 884, 894 (9th Cir. 1995) (extending Chevron deference to a letter because the statutory interpretation contained in that letter is "based on a permissible construction of the existing statutory language"). Moreover, an agency interpretation that does not qualify for Chevron deference may still "merit some deference whatever its form, given the 'specialized experience and broader investigations and information' available to the agency." United States v. Mead Corp., 533 U.S. 218, 234 (2001) (quoting Skidmore

agency has stated, for instance, that the eligibility inquiry must "[d]raw upon information from a variety of sources, including aptitude and achievement tests, parent input, and teacher recommendations, as well as information about the child's physical condition, social or cultural background, and adaptive behavior." 34 C.F.R. § 300.306(c)(1)(i); see also id. § 300.304(b)(1) (noting that the evaluation of whether the child is a child with a disability must "[u]se a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child"). Additionally, in responding to a comment suggesting that the eligibility determinations should include "standardized, individualized testing (not just criterion-based testing or functional assessments)," the agency wrote, "Nothing in the [IDEA] or . . . regulations would preclude the eligibility group from considering results from standardized tests when making eligibility determinations." Assistance to States for the Education of Children With Disabilities and Preschool Grants for Children With Disabilities, 71 Fed. Reg. 46,540, 46,651 (Aug. 14, 2006).

_____

v. Swift, 323 U.S. 134, 139 (1944)). Here, we find the agency interpretations in the regulations and letters persuasive, even under the lesser Skidmore deference, and hence do not address the particular level of deference afforded to these materials. See E.M. ex rel. E.M. v. Pajaro Valley Unified Sch. Dist., 758 F.3d 1162, 1174 (9th Cir. 2014).

- 15 -

The regulations also indicate the relevance of a child's overall academic performance to an SLD determination. The agency has noted, for instance, that "[f]or a child suspected of having [an SLD], . . . the documentation of the determination of eligibility . . . must contain a statement of . . . [t]he basis for making the determination, including an assurance that the determination has been made in accordance with § 300.306(c)(1)," 34 C.F.R. § 300.311(a), (a)(2) -- which suggests that the broad base of measures identified in § 300.306(c)(1) apply to identifying an SLD. Moreover, a related regulation states that an SLD determination must take into account "information from an observation in routine classroom instruction and monitoring of the child's performance" before the child is referred for an evaluation for eligibility purposes, or, similarly, "observation of the child's academic performance in the regular classroom" after the child has been referred for such evaluation. Id. § 300.310(b).

We find the reference to "the child's academic performance" notable. In a prior version of a related regulation, the agency stated that the "evaluation" procedures used to determine whether a child has a disability are limited to "procedures used selectively with an individual child and do[] not include basic tests administered to or procedures used with all children in a school, grade, or class." Id. § 300.500(b) (July 1, 1998). The language excluding such "basic tests" and "procedures,"

however, which would seemingly exclude Jane's grades and NECAP and NWEA scores from the first prong inquiry, was removed from the definition of "evaluation" by the following year, see id. § 300.500(b)(2) (Mar. 12, 1999), and does not appear in the current version of the regulation in effect, see id. § 300.500 (Oct. 13, 2006). "A change of [statutory] language is some evidence of a change of purpose." Johnson v. United States, 225 U.S. 405, 415 (1912). The changes in the definition of a relevant term in the regulation hence reinforce our understanding that an SLD determination may consider a broader range of assessments, including a child's school grades, classroom performance, and standardized test scores, even when they are not tailored to measure the specific area of the child's deficiency. See generally Assistance to States for the Education of Children With Disabilities and the Early Intervention Program for Infants and Toddlers With Disabilities, 64 Fed. Reg. 12,406, 12,410 (Mar. 12, 1999) (noting that the definition of "'evaluation' (§ 300.500(b)(2)) has been revised by deleting the last sentence of the definition, to ensure that evaluations may include a review of a child's performance on a test or procedures used for all children in a school, grade, or class").

We add two important qualifications. First, because the text of 34 C.F.R. § 300.309(a)(1) makes clear that a deficiency in "one or . . . more of the following areas," including reading

- 17 -

fluency, is sufficient to support an SLD, the consideration of a child's academic measures under the first prong requires consideration of the nexus between those academic measures and the area of the child's deficiency. See also id. § 300.310(a) (providing that a child must be "observed in the child's learning environment (including in regular classroom setting) to document the child's academic performance and behavior in the areas of difficulty" (emphasis added)). That is to say, Jane's straight-A grades and NECAP and NWEA scores -- whose relevance to her reading fluency ability is not readily apparent[8] -- may be considered in determining her reading fluency deficit only insofar as they are indicative of her fluency skills.[9] See, e.g., Ms. H. ex rel. T.H. v. Montgomery Cty. Bd. of Educ., No.2:10cv247-WHA-SRW, 2011 WL 666033, at *11 (M.D. Ala. Feb. 14, 2011) (noting that "the evidence of low [school] grades leans in [the child's] favor" in identifying

_____

[8] The hearing officer observed, for instance, that NWEA "is untimed and has multiple choice answers, so it is not the kind of test that would normally pose a challenge for the student's areas of weakness."

[9] The Does contend that a child's generalized academic measures, such as school grades and NECAP and NWEA scores, do not assess reading fluency. We are ill-equipped, however, to make what appears to be a clinical determination that such academic measures could never reflect a reading fluency deficit or deficiency in any particular area. Hence, we rely instead on the regulatory provisions that allow for broader academic performance to be considered in the eligibility inquiry and SLD determination, and leave it to the parties to prove, through expert testimony and other relevant evidence, the nexus between generalized academic measures and the child's area of deficiency.

an SLD "only to the extent that the low grades may have been caused by a[n] [SLD]").

The capacious interpretation of § 300.309(a)(1) adopted by the district court is incorrect. In relying on Jane's overall academic record under the first prong, the district court reasoned that, "[b]ecause § 300.309(a) . . . assign[s] to the IEP team the task of determining whether a student 'achieves adequately' for her age or meets 'State-approved grade-level standards,' consideration of grades and state standardized test scores is appropriate," without requiring any proof of the relevance of those measures to Jane's reading fluency skills. The phrase "achieve[s] adequately," however, is modified by "in one or more of the following areas" in § 300.309(a)(1), meaning that any such adequate achievement must be in the area of the student's deficiency -- here, reading fluency.

With the scope of the consideration of Jane's academic record narrowed to those components reflective of her reading fluency ability, we address the second qualification -- namely, the weight that may be accorded to generalized academic performance, particularly in a situation, like here, where academic record points in a different direction from the results of specific reading fluency assessments. Jane's academic record is indisputably excellent: she has received straight-A grades, with or without special education, and has performed well on state

standardized exams. On the other hand, Jane has received average-range or arguably below-average scores on an array of tests that were administered specifically to measure her reading fluency, such as GORT-5, TOWRE-2, the Nelson Denny Test, and the reading fluency probes. The question hence arises whether and to what extent Jane's generalized academic measures -- if proven to be a fair indicator of her reading fluency ability -- may counteract the more negative results of her specific reading fluency assessments.

As a starting point, the agency has made clear that "[n]o assessment, in isolation, is sufficient to indicate that a child has an SLD" based on any of the listed areas in 34 C.F.R. § 300.309(a)(1), including and particularly reading fluency. 71 Fed. Reg. at 46,652; see also id. ("[D]etermining eligibility for special education and related services cannot be based on any single measure or assessment as the sole criterion for determining whether a child is a child with a disability."). The emphasis on a holistic inquiry in identifying an SLD has particular salience in this case because reading fluency was added to the list of disabilities in part to identify students who, like Jane, excel academically but may have an SLD based on a fluency deficit. In response to commenters who "recommended removing reading fluency from the list in § 300.309(a)(1)," the agency defended its decision to include reading fluency as a category, observing that

"[i]ncluding reading fluency in the list of areas to be considered when determining whether a child has an SLD makes it more likely that a child who is gifted and has an SLD would be identified." Id. at 46,652; see also Letter from Alexa Posny, Acting Director of the Office of Special Education Programs, U.S. Department of Education, to Anonymous, U.S. Dep't of Educ. (Jan. 13, 2010) (hereinafter, "Letter to Anonymous") (noting that, while "[t]he IDEA is silent regarding 'twice exceptional' or 'gifted students[,]' . . . [i]t remains the Department's position that students who have high cognition" but struggle with, for instance, "reading and math fluency" may still satisfy the two prongs of the eligibility inquiry).

Thus, as a preliminary matter, we determine that, much as no single assessment or measure could support a finding of a reading fluency deficit, no single assessment or measure may undermine a finding of a reading fluency deficit where other measures could support such a finding. See generally 34 C.F.R. § 300.304(c)(2) (emphasizing a holistic inquiry by requiring "assessments and other evaluation materials [to] include those tailored to assess specific areas of educational need and not merely those that are designed to provide a single intelligence quotient"). This is especially true when the child's generalized academic performance contradicts the results of his or her specific reading assessments. Indeed, in the inevitable weighing of factors

in discerning a reading fluency deficit, the hurdle is higher for generalized academic measures to provide a counterweight. The parties agree that assessments, such as GORT-5, TOWRE-2, and the reading fluency probes, measure reading fluency, and they were administered to Jane for the specific purpose of determining her fluency skills. Jane's overall academic performance, by contrast, is multi-faceted, and was the result, at least in part, of her high intelligence, hard work, and devoted parents, as well as accommodations provided by the school, such as extended time for completing an exam.[10]

Hence, when the risk is high that a child's overall academic performance could mask her learning disability because of innate or ancillary factors specific to that child, and the regulations included that disability category to mitigate such masking, see 71 Fed. Reg. at 46,652, generalized academic measures -- even when proven to be a fair indicator of the child's learning disability -- must have high probative value to outweigh specific disability measures in identifying an SLD. See 34 C.F.R.

_____

[10] These accommodations are not part of special education or related services, and neither party has argued otherwise. We note, moreover, that certain accommodations identified by the Does would likely continue to be available to Jane even without special education. As the hearing officer noted, the school district "explained that even without special education, [Jane] could have reasonable accommodations such as extended time on assignments and assessments, and offered to meet with [the Does] to discuss the possibility of an intervention plan."

§ 300.304(b)(3) (noting that evaluation for eligibility purposes must "[u]se technically sound instruments that may assess the relative contribution of cognitive . . . factors" (emphasis added)).  We do not decide, however, the precise weight that must be afforded to those relevant academic measures in the abstract.  In addressing other categories of disorders under 20 U.S.C. § 1401(3)(A)(i), the U.S. DOE has cautioned that a disability must be determined "on a case-by-case basis, depending on the unique needs of a particular child and not based only on discrepancies in age or grade performance in academic subject areas."  Letter from Alexa Posny, Director of the Office of Special Education Programs, U.S. Department of Education, to Catherine D. Clarke, Director of Education and Regulatory Advocacy, American Speech and Hearing Association, U.S. Dep't of Educ. (Mar. 8, 2007).  The same is true of an SLD based on a reading fluency deficit.  How much weight is due any given measure in identifying a reading fluency deficit must depend on the unique circumstances of the child.  Thus, with the guidance provided herein, we leave it to the IEP team, the hearing officer, or the district court to determine, in the first instance and on an individual basis, the precise weight of any and all relevant measures in conducting the first prong inquiry.

Based on the foregoing analysis, we conclude that the district court erred in relying on Jane's overall academic achievements without assessing the relevance of such achievements

to her reading fluency skills.  Accordingly, we vacate and remand the case.  On remand, the court should first determine whether Jane's generalized academic measures, such as school grades and NECAP and NWEA scores, may serve as fair proxies of her reading fluency ability.  If the court answers that question in the affirmative, it should then weigh all relevant factors and decide whether those components of Jane's academic performance that reflect her reading fluency skills could counteract the (relatively) negative results of specific reading fluency assessments.

## B.  Judicial Review Standard and Additional Evidence

We also address here related errors the district court committed in conducting the first prong inquiry.  The Does argue that the district court failed to make an independent judgment as to Jane's reading fluency deficit because the court deferred to the hearing officer's factual findings on reading fluency assessments, while summarily dismissing the post-hearing evidence that they submitted.  Specifically, the Does contend that the district court failed to consider Jane's scores on GORT-5, the Nelson Denny Test, and the reading fluency probes as relevant demonstrations of her reading fluency deficit.  They also claim that these errors stemmed in part from the district court's mistaken understanding of the action as an appeal of an administrative decision, as indicated by the court's references to

the term "appeal" in its order, when it is, in fact, a "civil action."

We reject the argument that the court's references to an appeal suggest any analytical confusion. See Kirkpatrick v. Lenoir Cty. Bd. of Educ., 216 F.3d 380, 385 & n.4 (4th Cir. 2000) (acknowledging that, "[o]ut of convenience and expediency, many courts use language suggesting that they are affirming or reversing the decision of the state administrative agency"); see also Sebastian M. v. King Philip Reg'l Sch. Dist., 685 F.3d 79, 84 (1st Cir. 2012) ("[A]n appeal of the administrative hearing officer's final decision may be taken to either a federal or state court of competent jurisdiction."); D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 564 (3d Cir. 2010) (referring to judicial review of a hearing officer's decision as an "appeal").

More problematic, however, is the district court's treatment of the additional evidence and the deference it extended to the hearing officer's factual findings. Judicial review of administrative decisions in IDEA cases "requires a more critical appraisal . . . than clear-error review," but "nevertheless, falls well short of complete de novo review." Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1086 (1st Cir. 1993). In the course of this "involved oversight," S. Kingstown Sch. Comm. v. Joanna S. ex rel. P.J.S., 773 F.3d 344, 349 (1st Cir. 2014) (citation omitted), a court must make "bounded, independent decisions -- bounded by the

administrative record and additional evidence, and independent by virtue of being based on a preponderance of the evidence before the court," <u>Town of Burlington</u> v. <u>Dep't of Educ. for Commonwealth of Mass.</u>, 736 F.2d 773, 791 (1st Cir. 1984).

Here, the district court accorded excessive deference to the hearing officer's determination that Jane did not have a reading fluency deficit. One illustration of such deference is the court's dismissal of the significance of GORT-5 (as administered by Papageorge) and the Nelson Denny Test. The district court disregarded those measures because the hearing officer "explicitly gave less weight to the results from Papageorge's evaluation" based on the understanding that "Papageorge 'is not licensed or certified to diagnose processing disorders or to evaluate them.'" In a footnote to this sentence, the district court added that the hearing officer "also gave less weight to Doiron's testimony after finding that he undermined his own credibility by withholding [certain test results] from the IEP team."

This reasoning suggests a mistaken understanding of the record. To the extent that the district court attributed both GORT-5 and the Nelson Denny Test to Papageorge's evaluation, Papageorge administered only GORT-5, not the Nelson Denny Test. Moreover, GORT-5 was not the test with regard to which the hearing officer found Papageorge to be "not licensed or certified."

Instead, the hearing officer discounted the probative value of GORT-5 because it was a more difficult test than GORT-4 (on which Jane performed better), and it was unclear whether Jane's GORT-5 score was "an indication of a decline in reading skills or simply the product of a harder test." As to the Nelson Denny Test, which was administered by Doiron, it is not clear from the record whether the district court addressed its relevance at all, since the reference to the credibility of Doiron in the footnote does not appear to concern the Nelson Denny Test.

Hence, the district court erred in disregarding GORT-5 and the Nelson Denny Test, based on a mistaken understanding of the record, without making any judgment as to the relevance of those measures to identifying an SLD. While the district court should afford varying degrees of deference to the hearing officer depending on the persuasiveness of the administrative finding, see Lenn, 998 F.2d at 1087, the duty of an "involved oversight" requires that the court make an independent judgment on the relevance (or credibility) of the measures in dispute, S. Kingstown Sch. Comm., 773 F.3d at 349. Relatedly, the court seems to have addressed the hearing officer's purported treatment of GORT-5 and the Nelson Denny Test only in the context of discussing whether Jane meets the state law requirement on the first prong of the eligibility inquiry, see infra Part III (discussing the state law standards), not in determining whether she has a reading fluency

deficit under the federal standard, see 34 C.F.R. § 300.309(a)(1); 20 U.S.C. § 1401(3)(A)(i). On remand, therefore, the court should exercise independent judgment in assessing the relevance of GORT-5 and the Nelson Denny Test in identifying a reading fluency deficit under federal law.[11]  See Town of Burlington, 736 F.2d at 791.

In purporting to defer to the hearing officer's factual determinations, the district court also failed to properly consider the additional evidence submitted by the Does. The IDEA instructs the courts to "receive the records of the administrative proceedings," "hear additional evidence at the request of a party," and grant relief "as the court determines is appropriate" based on a preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(C). Prior to the district court's hearing, the Does submitted additional evidence in the form of an affidavit attesting to Jane's continuing struggles with reading fluency. Specifically, the affidavit contained the results of Jane's more recent reading fluency probes,

---

[11] For instance, if the district court determines that the Nelson Denny Test need not be excluded based on the credibility of Doiron, the court may have to resolve the dispute over the relevance of this measure to reading fluency. As the district court observed in explaining the factual background, there was a dispute between the parties over the validity of the Nelson Denny Test as a reading fluency measure because it "only counts the number of words read, not accuracy." The hearing officer does not appear to have resolved this dispute, instead finding that, "[a]lthough reading fluency is an area of weakness for [Jane], it did not prevent her from earning consistently excellent grades or from doing well on Maine standardized tests."

which the Does argued were more accurate than the earlier ones that were before the hearing officer. The Does asserted that the recent fluency probes, when combined with Jane's poor performance on certain fluency tests, demonstrated her overall deficiency in reading fluency.

The district court declined to consider the additional evidence. The court reasoned that it was not "necessary" for the court to "resolve the question of which reading fluency probes are more accurate" because the old reading fluency probes received only "scant consideration" from the hearing officer and the IEP team. The district court went on to note, "Given that the IEP Team did not consider this measure, and the Hearing Officer gave no more than glancing consideration to it, the Does have not established that fluency probes improperly led Cape Elizabeth to determine that Jane does not qualify for special education services under 300.309(a) and [state law]."

That is an incorrect approach to the consideration of the additional evidence. The fact that the hearing officer "gave no more than a glancing consideration" to the reading fluency probes does not preclude the district court from considering such evidence, whether it is the old reading fluency probes or the new ones submitted by the Does. Indeed, courts are required to make "bounded, independent decisions -- bounded by the administrative record and additional evidence, and independent by virtue of being

based on a preponderance of the evidence before the court." Town of Burlington, 736 F.2d at 791. Thus, the district court erred in dismissing both the old and new reading fluency probes on account of the hearing officer's failure to address them. See id. at 790-92 (observing that the post-hearing evidence may "bring[] the court up to date on the child's progress" and should be considered if "additional"); see also E.M. ex rel. E.M. v. Pajaro Valley Unified Sch. Dist., 652 F.3d 999, 1006 (9th Cir. 2011) (concluding that the district court applied an inappropriate standard for determining admissibility of post-hearing evidence).

We provide one further instruction on the appropriate judicial review standard in considering the additional evidence. We have previously held that, in reviewing the hearing officer's determination in IDEA cases, "the persuasiveness of a particular administrative finding, or the lack thereof, is likely to tell the tale." Lenn, 998 F.2d at 1087; see M.H. & E.K. ex rel. P.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 244 (2d Cir. 2012) (noting that persuasiveness of an administrative finding "will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court"). Hence, where the post-hearing evidence is credible so as to question the persuasiveness

of the hearing officer's decision, see, e.g., Schaffer v. Weast, 554 F.3d 470, 475 (4th Cir. 2009), a court should extend less deference to the hearing officer's determinations. That is to say, "the district court should afford more deference when its review is based entirely on the same evidence as that before the [hearing officer] than when the district court has before it additional evidence that was not considered by the [officer]." M.H., 685 F.3d at 244; see Alex R. ex rel. Beth R. v. Forrestville Valley Cmty. Unit Sch. Dist. No. 221, 375 F.3d 603, 612 (7th Cir. 2004) ("The more that the district court relies on new evidence, . . . the less it should defer to the administrative decision: '[j]udicial review is more searching the greater the amount (weighted by significance) of the evidence that the court has but the agency did not have.'" (alteration in original) (quoting Sch. Dist. of Wis. Dells v. Z.S. ex rel. Littlegeorge, 295 F.3d 671, 675 (7th Cir. 2002))).

Accordingly, on remand, the district court -- if it is assured of the credibility or persuasiveness of the additional evidence on reading fluency -- should make an independent judgment, with less deference to the hearing officer, about whether Jane has a reading fluency deficit in light of the additional evidence and the entire administrative record. The fact that the old reading fluency probes received "no more than glancing consideration" by the hearing officer should present no obstacle to the court's

- 31 -

consideration of the old or new fluency probes as a relevant measure in discerning a reading fluency deficit.

## C.  Second Prong of the Eligibility Inquiry

Because the district court found that Jane does not have an SLD, it did not address the second prong.[12]  The Does suggest on appeal, however, that a reading fluency deficit can by itself satisfy both prongs of the eligibility inquiry, and that Jane's academic performance may not be considered in assessing her need for special education.

The second prong of the "child with a disability" definition provides that a child with an SLD must, "by reason thereof," "need[]" special education and related services to be eligible.  20 U.S.C. § 1401(3)(A)(ii).  The ambiguity in the need inquiry (and hence the dispute here) arises from the incompleteness in this definitional statement.  By its own terms, the need provision seems to be missing a prepositional phrase that would modify "special education and related services," or, to put it descriptively, what the child needs special education for.  Id. The Does contend that the inquiry should focus narrowly on whether a child needs special education to improve the skills specific to

_____

[12] While the hearing officer determined that Jane did not need special education, the officer addressed the need issue only briefly and as an alternative ground for ineligibility, having found -- as did the school -- that Jane did not have a reading fluency deficit.

the disability, here, a reading fluency deficit.  The school district, by contrast, contends that the need inquiry should examine broadly whether a child requires special education to benefit from the school curriculum.

My colleagues do not wish to resolve these competing arguments, having concluded that this appeal, in its present posture, can be resolved without addressing the need inquiry.[13] Moreover, they are troubled by the scant attention that the parties gave to the need inquiry in the district court.  Nevertheless, the panel agrees on the following two points.  First, insofar as Jane's academic performance is relevant under the first prong, consideration of her grades and standardized test results is not categorically barred under the need inquiry any more than it is categorically barred under the first prong inquiry.  Indeed, when qualified this way, Jane's overall academic performance is relevant to the need assessment under either of the competing constructions proposed by the parties.  Second, we emphasize that the need assessment -- irrespective of its purpose -- requires at a minimum that a child with a disorder "need[]" special education. 20 U.S.C. § 1401(3)(A)(ii).  That is, a child who needs only accommodations or services that are not part of special education

_____

[13] The writing judge believes that an interpretation of the need inquiry is necessary in this case and hence expresses his views in a separate concurring opinion.  See infra.

to fulfill the objective of the need inquiry does not "need" special education.

With this guidance, we leave it to the district court to decide, if it becomes relevant, the nature of the need inquiry and whether Jane has shown a need for special education.

### III.

We briefly address the issues regarding the state eligibility standards. Much of the analyses involving Jane's reading fluency skills by the IEP team, the hearing officer, and the district court concerned whether Jane's performance on reading fluency measures demonstrated that she has "a disorder in one or more of the basic psychological processes," meaning that she exhibits "scores 1.5 or more standard deviations below the mean for the child's age on tests in one area of psychological processing, or 1 or more standard deviations below the mean in two or more areas of psychological processing." Maine Unified Special Education Regulation ("MUSER") § VII.2.L(1), (2)(a)(ii) (hereinafter, "processing disorder requirement"). Indeed, in addition to finding that Jane does not meet the federal eligibility standard, the district court appears to have adopted the hearing officer's determination that Jane did not satisfy MUSER's processing disorder requirement under the first prong inquiry. Viewing its federal ruling as an adequate basis for denying eligibility, however, the district court did not address the

separate argument advanced by the Does that the processing disorder requirement is overly restrictive and hence incompatible with federal law.

As relevant here, the Does argue that whether MUSER's processing disorder requirement is preempted under federal law is not part of this appeal. The school district does not disagree, stating only that, if we were to address the validity of the processing disorder requirement, we should uphold it. Additionally, as an alternative basis for affirming the district court's decision, the school district invokes a separate MUSER provision governing the need inquiry. That provision states that a child with a disorder "needs" special education "when, because of the disability, the child can neither progress effectively in a regular education program nor receive reasonable benefit from such a program in spite of other services available to the child." MUSER § VII.2. In response, the Does argue -- though only briefly in their reply brief -- that MUSER's "need" provision, much like its processing disorder requirement, is inconsistent with federal law.

We do not address here whether Jane has a "psychological processing disorder" under MUSER in light of the uncertainty over the validity of this requirement, nor do we decide the legality of MUSER's "need" provision. Given that neither the hearing officer nor the district court addressed the preemption issue (and that

the briefing on this question is limited), we deem it prudent to allow the district court to make that determination, if needed, with the aid of further briefing provided by the parties. Such determination may well become necessary, for instance, if the court finds on remand that Jane meets the federal eligibility standards, but not MUSER's "processing disorder" or "need" standards.

## IV.

In summary, we vacate and remand this case with the following instructions. On remand, the district court should first decide whether Jane has a reading fluency deficit. In making this determination, the court may consider Jane's overall academic performance, insofar as her generalized academic record is shown to be a fair indicator of her reading fluency deficit, as well as the results of specific reading fluency assessments. The court should also exercise independent judgment, with the appropriate level of deference to the hearing officer as set forth herein, in resolving issues concerning Jane's alleged reading fluency deficit.

If the district court finds that Jane has a reading fluency deficit, it should then determine how the need inquiry should be interpreted and whether Jane meets the need standard under the IDEA. See 20 U.S.C. § 1401(3)(A)(ii). Regardless of the approach it adopts, consideration of Jane's academic record is not categorically barred under the need assessment any more than

it is categorically barred under the first prong inquiry, so long as it was determined to be relevant in discerning her reading fluency deficit.

Additionally, if the court decides that Jane meets the federal eligibility standards but not the state standards, the court may have to address the validity of MUSER's processing disorder requirement and "need" provision.

Finally, if the district court determines that it would benefit from having the hearing officer make additional findings on issues on remand, the court can stay the proceedings and remand to the hearing officer to make relevant determinations.

Costs are awarded to appellants.

So ordered.

**-Concurring Opinion Follows-**

**LIPEZ**, <u>Circuit Judge, concurring</u>. My colleagues believe that the opinion to this point resolves the issues presented in this appeal and that going further to address the need prong of the eligibility inquiry would be unnecessary. I believe, however, that we should address that difficult legal issue to provide further guidance to the district court on remand. It has been raised by the parties, however imperfectly. That guidance could be important for the disposition of this case and future disputes about eligibility for special education. There is, moreover, a dearth of First Circuit law on the nature of the need inquiry. We should not leave the district court at sea on such an important issue. Hence, I write a separate concurrence to express my views on the subject.

As the panel opinion explains, the dispute between the parties concerning the need inquiry arises from the ambiguity in the text of the need provision. Section 1401(3)(A)(ii) of the IDEA provides that a child determined to have one of the qualifying disorders under the first prong must also, "by reason thereof," "need[] special education and related services" to be eligible for special education. 20 U.S.C. § 1401(3)(A)(ii). The Does argue that the need inquiry should determine whether a child needs special education to remediate the underlying disability, whereas the school district argues that the need inquiry should determine

- 38 -

whether a child needs special education to benefit from the school curriculum.

"It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." Davis v. Mich. Dep't of Treasury, 489 U.S. 803, 809 (1989). In Board of Education v. Rowley, 458 U.S. 176 (1982), the Supreme Court addressed what a child with a disability (i.e., a child who has satisfied the two-pronged eligibility requirements) is entitled to as part of his or her special education. I find Rowley instructive in understanding the statutory framework and hence rely on it for guidance in interpreting the need inquiry.

Amy Rowley was a deaf student who had minimal residual hearing. See id. at 184. After she was determined to be eligible for special education, an IEP was developed which provided for, among other things, a hearing aid, instruction from a tutor for the deaf, and separate instruction from a speech therapist. Id. Amy's parents, the Rowleys, agreed with parts of the IEP, but insisted that Amy be provided a sign-language interpreter in all her academic classes "in lieu of the assistance proposed in other parts of the IEP." Id. The school refused, having determined that Amy "did not need . . . an interpreter" based on, inter alia, "testimony from Amy's teacher and other persons familiar with her academic and social progress." Id. at 184-85. An independent

examiner agreed, noting that "an interpreter was not necessary because [the child] was achieving educationally, academically, and socially without such assistance." Id. at 185 (internal quotation marks omitted).

The Rowleys challenged the school's decision in federal court. Id. The district court observed that "Amy is a remarkably well-adjusted child who interacts and communicates well with her classmates and has developed an extraordinary rapport with her teachers." Id. (internal quotation marks omitted). The court also acknowledged that "she performs better than the average child in her class and is advancing easily from grade to grade." Id. (internal quotation marks omitted). Despite these achievements, however, the district court found that Amy "underst[ood] considerably less of what goes on in class than she could if she were not deaf" and hence was "not learning as much, or performing as well academically, as she would without her handicap." Id. (internal quotation marks omitted). That "disparity between Amy's achievement and her potential" led the district court to conclude that her IEP -- without also providing an interpreter in her classes -- fell short of the "free appropriate public education" to which she was entitled. Id. at 185-86. Indeed, defining "free appropriate public education" as "an opportunity to achieve [the child's] full potential commensurate with the opportunity provided to other children," the district court reasoned that evaluating

the sufficiency of special education "requires that the potential of the [child with a disability] be measured and compared to his or her performance, and that the resulting differential or shortfall be compared to the shortfall experienced by [children without disabilities]."  Id. at 186 (internal quotation marks omitted).

The Supreme Court rejected that precise formulation for assessing the sufficiency of an IEP.  Recognizing that the IDEA does not prescribe any substantive standard for determining the level of special education that must be afforded to eligible children, the Court nonetheless emphasized that the phrase "free appropriate public education" should be given meaning.[14]  See id. at 187-89; see also 20 U.S.C. § 1400(d)(1)(A) (defining the purposes of the IDEA as, inter alia, "ensur[ing] that all children with disabilities have available to them a free appropriate public education").  As the Court explained it, "the requirement that a State provide specialized educational services to [children with disabilities] generates no additional requirement that the services so provided be sufficient to maximize each child's potential 'commensurate with the opportunity provided other

_____

[14] Rowley refers to the Education of the Handicapped Act.  See 458 U.S. at 179.  This Act was renamed the Individuals with Disabilities Education Act in 1990.  See Education of the Handicapped Act Amendments of 1990, Pub. L. No. 101-476, 104 Stat. 1103 (1990).

children.'" Rowley, 458 U.S. at 198 (quoting the district court's opinion). Instead, what Congress sought to provide under the IDEA is education "sufficient to confer some educational benefit upon [the child with a disability]." Id. at 200. That is to say, instead of "an opportunity to achieve [the child's] full potential," id. at 186, the IDEA ensures "a basic floor of opportunity," id. at 201 (internal quotation marks omitted), under which a child with a disability is given access to "the regular classrooms of a public school system," id. at 203. The sufficiency of the education provided in the classroom, the Court further explained, is measured by "the educational progress of the child" based on "[r]egular examinations[,] . . . grades[,] . . . and yearly advancement to higher grade levels." Id. at 202-03.

Rowley's pronouncements on the purpose of special education reject a construction of the need inquiry that is not similarly anchored in the "educational benefits" or "educational progress" that a child derives from school. Id. at 202, 203. Indeed, if an important determinate of the adequacy of special education is the extent to which a child is receiving educational benefits in "the regular classrooms of a public school system," id. at 203, it makes little sense to exclude such a consideration from determining whether the child needs special education in the first instance. As the agency has clarified, once "a determination is made that a child has a disability and needs special education

and related services, an IEP must be developed for the child." 34 C.F.R. § 300.306(c)(2). The evaluation procedures used in assessing that need (and more broadly the eligibility) are also used in assessing the adequacy of special education or an IEP. See 20 U.S.C. § 1414(b)(2)(A)(i), (ii) (noting that the local educational agency shall "use a variety of assessment tools and strategies . . . that may assist in determining" "whether the child is a child with a disability" and "the content of the child's [IEP]"); 34 C.F.R. § 300.304(b)(1)(i), (ii) (same); see also 20 U.S.C. § 1414(c)(B) (iii), (iv) (prescribing the same evaluation process for determining "whether the child needs special education and related services" and "whether any additions or modifications to the special education and related services are needed to enable the child to meet the measurable annual goals set out in the [IEP]"); 34 C.F.R. § 300.305(a)(2)(iii), (iv) (same). Additionally, as Rowley demonstrates, an inquiry into the sufficiency of special education also encompasses (or is capable of encompassing) an examination into the child's "need." See 458 U.S. at 185 (reciting the school's decision that Amy Rowley did not "need" an interpreter, and the independent examiner's determination that an interpreter was "not necessary").

A court must interpret a statute "as a symmetrical and coherent regulatory scheme," FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000) (quoting Gustafson v. Alloyd Co.,

- 43 -

513 U.S. 561, 569 (1995)), and "fit, if possible, all parts into an harmonious whole," id. (quoting FTC v. Mandel Brothers, Inc., 359 U.S. 385, 389 (1959)).  Reading the eligibility and sufficiency-of-an-IEP determinations as "parts [of] an harmonious whole," id., I reject the Does' interpretation of the need inquiry, to the extent that it focuses solely on remediating the underlying disability, without regard to the "educational progress" a child is making in school.  Nonetheless, I recognize that remediation of the underlying disability is also relevant in assessing the need. After all, the statute specifies that a child must "need[]" special education "by reason [of]" the disorder as identified under the first prong, 20 U.S.C. § 1401(3)(A)(ii), and that special education must be designed "to meet the unique needs of [the] child with a disability," id. § 1401(29) (emphasis added).  Thus, in accordance with the applicable statutory canon and the text of the relevant statute, I understand the need inquiry to assess whether a child with a disorder needs special education to remediate the underlying disability, insofar as the disability impedes the child's "educational progress" in school or, to put it differently, the "educational benefits" that a child derives from school.

Having so interpreted the need inquiry, the relevance of a child's academic achievements becomes clear.  The Rowley Court noted that "[t]he grading and advancement system . . . constitutes an important factor" in determining whether the education provided

to eligible children is "appropriate."  458 U.S. at 203; see also 34 C.F.R. § 300.305(a)(2)(ii) (providing that evaluations include data necessary to determine "the present levels of academic achievement and related developmental needs of the child").  So, too, is a child's overall academic performance in determining his or her need for specialized instruction.  Citing Rowley, the Fifth Circuit held that a child with an Attention Deficit Hyperactivity Disorder (cognizable under the first prong) did not "need" special education because his "passing grades and success on the [state-wide standardized] test demonstrate[d] academic progress," and because his "teachers testified that, despite his behavioral issues, he did not need special education and was achieving social success in school."  Alvin Indep. Sch. Dist. v. A.D. ex rel. Patricia F., 503 F.3d 378, 383-84 (5th Cir. 2007); see also D.A. & J.A. ex rel. M.A. v. Meridian Joint Sch. Dist. No. 2, 618 F. App'x 891, 893 (9th Cir. 2015) (considering the child's academic performance, as attested to by the school, in determining whether he needs special education to "benefit from his education" or "general school curriculum").  District courts and state educational agencies have likewise relied on a child's academic performance in conducting the need inquiry.[15]

---

[15] See Eric H. ex rel. Gary & Frances H. v. Judson Indep. Sch. Dist., No. Civ.A. SA01CA0804-NN, 2002 WL 31396140, at *2 (W.D. Tex. Sept. 30, 2002) (concluding that there is no "present need for special education" because the child exhibited "noted

- 45 -

I add an important coda to this conclusion, however. To say that the educational benefits that a child receives in school is an "important factor" in measuring his or her need, Rowley, 458 U.S. at 203, does not mean that a merely adequate academic performance must compel a finding of ineligibility, regardless of the child's potential. Indeed, in the absence of a statutory or regulatory directive, I am wary of invoking an absolute standard of educational performance, the satisfaction of which would automatically disqualify a child from eligibility under the need

improvements in his academic performance and social interactions"); Grant ex rel. Grant v. St. James Parish Sch. Bd., No. CIV.A.99-3757, 2000 WL 1693632, at *5 (E.D. La. Nov. 8, 2000) (finding ineligibility for special education where the student's grades and standardized test results were average or above average); see also Fenton Area Pub. Sch., 44 IDELR 293, 1495-96 (Mich. SEA Nov. 9, 2005) (holding that a child with dyslexia who never received a grade lower than a B+ did not need special education, despite the alleged discrepancy between her potential and educational performance, because "[s]pecial education is not designed for students who are already successful in regular education"); R.B. ex rel. F.B. v. Napa Valley Unified Sch. Dist., No. 3:04-cv-00094-BZ, 43 IDELR 188, 863 (N.D. Cal. June 2, 2005) (observing that the child did not need special education because she performed above average academically); C.J. ex rel. M.J. & J.J. v. Indian River Cty. Sch. Bd., No. 02-14047-CIV-MOORE, 39 IDELR 186, 1972 (S.D. Fla. July 6, 2003) (finding ineligibility where the student's "performance in the classroom indicates that she requires neither specially designed services nor related services for her to benefit from education"); In re Hollister Sch. Dist., 26 IDELR 632, 649 (Cal. June 16, 1997) ("[B]ased on [the student's] ability to receive commendable grades in the absence of special education services, . . . the ability to show progress on measures of academic achievement, and to pass successfully from grade to grade, . . . [the] student did not require [special education].").

prong.  Rowley held only that special education need not maximize a child's potential, not that special education is immaterial to helping the child better realize his or her potential.[16]  458 U.S. at 198, 2000.  Additionally, the Rowley Court itself rejected an approach that would deem every child with a disability "who is advancing from grade to grade in a regular public school system" as receiving "appropriate" education.  Id. at 203 n.25.  Hence, I acknowledge that, while a child may not establish a need for special education based solely on the disparity between her potential and her current academic performance, such a disparity may be taken into account when the current academic performance is merely adequate and falls far short of the child's demonstrated potential.  The specifics of such a calibrated inquiry should, of course, be further developed on a case by case basis.

In a similar vein, I do not confine "educational progress" or "educational benefits" to strictly academic performance.  In Rowley, the district court had found that Amy was "a remarkably well-adjusted child who interact[ed] and communicate[d] well with her classmates and ha[d] developed an extraordinary rapport with her teachers," id. at 185 (internal

---

[16] Similarly, the Rowley Court rejected the comparison of the disparity between potential and current academic achievements of a child with a disability to the disparities experienced by children without disabilities, not the consideration of such a disparity in the first place.  See 458 U.S. at 186, 189-90.

quotation marks omitted), and hence there was no need for the Court to discuss the relevance of a child's social or behavioral performance to the sufficiency-of-an-IEP inquiry. One can imagine a scenario, however, in which a child with a disorder is struggling with a social or behavioral problem that is traceable to the disability, and that interferes with the child's educational experience in school. Under such circumstances, I believe that an assessment of "educational benefits" or "educational progress" under the need prong must include, in addition to academic performance, broader aspects of the child's school experience. That is to say, even a child, like Jane, who is performing well above average according to grades and standardized test results, may be able to show a need for special education, if she can demonstrate a social or behavioral problem that hinders her ability to benefit from the educational experience in school.[17] See West Chester Area Sch. Dist. v. Bruce & Suzanne C. ex rel. Chad C., 194 F. Supp. 2d 417, 420 (E.D. Pa. 2002) ("There is no precise standard for determining whether a student is in need of special education,

---

[17] This interpretation of "educational benefits" and "educational progress" dispels the Does' concern that consideration of a child's academic record would lead to an "absurd[]" outcome where an intelligent child with a physical disability would be deemed not to need special education based solely on the fact that he performs well in academic classes. I reiterate that the construction of the need inquiry provided herein does not treat school grades or standardized test scores as decisive in the eligibility determinations.

and well-settled precedent counsels against invoking any bright-line rules for making such a determination."); Venus Indep. Sch. Dist. v. Daniel S. ex rel. Ron S., No. CIV.A. 301CV1746P, 2002 WL 550455, at *11 (N.D. Tex. Apr. 11, 2002) (observing that "need" under the IDEA is not "strictly limited to academics, but also includes behavioral progress and the acquisition of appropriate social skills as well as academic achievement"); see also Robert A. Garda, Jr., Untangling Eligibility Requirements Under the Individuals with Disabilities Act, 69 Mo. L. Rev. 441, 499 (2004) (observing that "attendance and behavior are educational performance that must be addressed despite good academic performance" under the need inquiry because "[t]hey are not merely means to the end of academic achievement, but are themselves educational ends").

The broader scope of the need inquiry is supported by the agency's emphasis on a holistic eligibility assessment. As the panel opinion notes, see supra Part II.B, the regulations provide that the eligibility inquiry must include a wide swath of measures and assessments, including a child's overall academic performance. See, e.g., 34 C.F.R. § 300.306(c)(1)(i) (noting that the eligibility determinations must "[d]raw upon information from a variety of sources, including aptitude and achievement tests, parent input, and teacher recommendations, as well as information about the child's physical condition, social or cultural

background, and adaptive behavior").  The emphasis on an inclusive inquiry applies to the need assessment as it does to an SLD determination.  See 20 U.S.C. § 1414(c)(1)(B)(i), (iii) (presuming that the same evaluation data would be used for determining both whether the child has a disability and "whether the child needs special education and related services"); 34 C.F.R. § 300.304(c)(6) (instructing that the eligibility inquiry should be "sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified" (emphasis added)).

In construing the scope of the need inquiry broadly, I do not discount the meaning of "need" in the second prong inquiry. 20 U.S.C. § 1401(3)(A)(ii).  Indeed, the panel is in agreement that even a child who performs below average academically or has social or behavior problems as a result of his or her disorder may not need specialized instruction to make educational progress in school, if that child can make such progress with certain accommodations that are not part of special education.  See supra Part II.C.

* * *

After careful consideration of the statute and governing case law, I am persuaded that the approach to the need inquiry outlined above is correct.  I believe that this guidance is

- 50 -

necessary and appropriate for the reasons already stated.  I, therefore, add this concurrence.